NEW YORK MAIL AND NEWSPAPER
TRANSPORTATION COMPANY
v.
The UNITED STATES.
No. 162–54.

United States Court of Claims.
July 31, 1957.

William L. Broad, Syracuse, N. Y., for plaintiff. Mackenzie, Smith, Lewis, Michell & Hughes, Syracuse, N. Y., were on the briefs.

John B. Miller, Washington, D. C., with whom was Assistant Attorney General George Cochran Doub, for the defendant. Alfred J. Kovell, Washington, D. C., was on the brief.

Before LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges and Mr. Justice REED (retired), of the Supreme Court of the United States.

REED, Justice (sitting by designation).

The plaintiff, New York Mail and Newspaper Transportation Company, brought this suit in this Court on April 15, 1954, against the United States to recover damages for an alleged breach by the Government of a contract between the United States and plaintiff. Various items, some variable, enter into the total damages claimed aggregating around two million dollars. That contract was for the rental by the Government of pneumatic tubes on Route 507011–A, New York, New York, for the transmission of the mails from January 1, 1951, through December 31, 1960.

On December 29, 1953, defendant, having closed down this Pneumatic Tube Service during that December with notice thereof to plaintiff, advised plaintiff that it considered the contract "null and void." The notice added, "The purported contract if valid is hereby cancelled in the public interest." Plaintiff, on January 23, 1954, notified defendant that the contract was terminated for breach by the Government. The plaintiff had allowed until January 22, 1954, for defendant to consider plaintiff's position that the defendant had no legal right to terminate the contract. In the letter plaintiff explained that on termination of the contract, its employees would be scattered and its property values impaired. Defendant has not used the property since December 1953.

The contract dated December 29, 1950, continued arrangements between the United States and the owners of the pneumatic tube service that had existed, with some intermissions since about 1897. The provisions of law underlying the various contracts and their terms varied substantially.[1] The contract before the one here in question ran from January 1 to December 31, 1950. Like those immediately preceding it, this contract was on a lease or rental basis with the Government operating the tube system and the lessor bearing the cost of repair and maintenance.

In preparation for handling New York mail after 1950, the Post Office Department on April 24, 1950, advertised for proposals for furnishing a pneumatic tube system generally on the same rental basis as the existing contract. The pertinent provisions of the governing statutes at that time required for pneumatic tube contracts a preliminary investigation and a favorable report on the practicalities of such service. "Advertisements shall state in general terms only the requirements of the service" calcu-

---

1. See 32 Stat. 114; 34 Stat. 1211; 35 Stat. 412; 42 Stat. 661; 62 Stat. 1103; 64 Stat. 1118.

lated to invite competitive bidding. They were to run for six weeks in not less than five newspapers. The contracts were to be subject to the postal laws and regulations relating to the letting of mail contracts. 39 U.S.C. (1946 ed.) § 423, 39 U.S.C.A. § 423. See finding 4.

Furthermore, 39 U.S.C. § 429, 39 U.S.C.A. § 429, directed:

"All contracts for carrying the mail shall be in the name of the United States and shall be awarded to the lowest responsible bidder tendering sufficient guaranties for faithful performance in accordance with the terms of the advertisement."

There is no contention that these requirements were not followed in the April 1950 advertisement for bids. However, plaintiff in its proposals to the United States in answer to the advertisement did not make its offer to contract in accordance with the terms of the advertisement. Instead, it submitted a proposal which specifically stated, "Conditions and requirements in your advertisement not specifically included in our proposal are intended to be excluded from our proposal." Finding 13.

■ Without detailing *in extenso* the variations between the invitation to bid and plaintiff's proposal and eventual contract, which appear in findings 12 to 23, inclusive, the conclusion is necessary that the variations were material. There was omitted the advertised requirement that the contract was to be subject to cancellation for failure of plaintiff to change the location of the system by reason of changes by the Government in the tube terminals, findings 12 and 14; that the Postmaster General might terminate the contract when the public interest might require, finding 12; and that the contractor should bear the expense of converting the system from DC to AC electricity, at a cost estimated between $125,000 and $350,000. Contract, variable costs, ¶ 2, Schedule A of contract, and finding 12. The cost turned

out to be $214,870.13. Finding 32. Plaintiff's proposal and contract required the assumption of this cost with interest by the Government through amortization. Instead of a rate per annum for rent, as called for by the advertisement for bids, the contract makes the rental vary from year to year, depending upon operating and general expenses, e. g., operating taxes, wages, amortization of electrical conversion cost. There was a limit to bring total compensation within the statutory authority of the Department on cost. This method of payment appears to assure plaintiff a guaranteed net rental for the system, limited by the overall power of the Department to contract for pneumatic tube service. See Act of 1950, 64 Stat. 1118.

The Government's defense, in accordance with its notice, is two-fold—(1) that the contract is void because of its material departure from the terms of the advertised invitation to bid, and (2) that the cancellation "in the public interest" of the contract on December 29, 1953, by the Postmaster General was a valid exercise of a retained power under § 97.67(b) of the Postal Laws and Regulations, Edition of 1948. As the second defense depends on a regulation that by its terms not only authorizes termination of a contract but settles all problems of damages, it should be considered first.

■ 1. The section, at all times during the advertisement, negotiation and termination of this contract, read as follows:

"(b) The Postmaster General may discontinue or curtail the service on any mail route, in whole or in part, in order to place on the route superior service, or whenever the public interests, in his judgment, shall require such discontinuance or curtailment for any other cause. The contractor shall be allowed, as full indemnity, one month's extra pay, on the amount of service dispensed with and a pro rata compen-

sation for the amount of service retained and continued.[2] "

The Government contends the section was made applicable to Service by Pneumatic Tubes by § 95.2. "The general provisions relating to contract service, Part 97 of this chapter, shall apply, so far as pertinent, to the pneumatic-tube service." As reports to the Postmaster General before his discontinuance of the route showed by unchallenged evidence that an annual savings in postal operations of over $700,000 would be made by substituting trucks for the tube system, there was a substantial factual basis for the cancellation, if there was power in the Postmaster General to cancel. Power is the nub of this issue. The regulation, if applicable to this contract, could not, of course, validly be waived by the Postmaster General in this particular instance.[3] Actually the contract right to cancel in the public interest called for by the advertisement was omitted from the contract. We do not speculate on the reason, for the contract was finally made pursuant to the authority of the Act of 1950. The section here applicable reads:

"Sec. 2. Contracts for the transmission of mail by pneumatic tubes or other mechanical devices shall be subject to the provisions of laws relating to the letting of mail contracts, except as otherwise provided in this Act. Advertisements shall state in general terms only the requirements of the service and shall be in the form best calculated to invite competitive bidding. The Postmaster General may reject any and all bids. No contract shall be awarded except to the lowest responsible bidder tendering full and sufficient guaranties to the satisfaction of the Postmaster General of his

ability to perform satisfactory service." 64 Stat. 1118.

Section 97.67(b) does not appertain to a "letting of mail contracts" but to their "discontinuance." Although the phrase "letting of mail contracts" has appeared in the statutes relating to pneumatic tube operation since 1902 (32 Stat. 114), we do not think that the regulation, § 97.67(b), should be read as authorizing the cancellation attempted in the notice of December 29, 1953. It is a harsh regulation when applied to a long term contract, requiring such a heavy investment by the other contracting party, largely useless for other activities. We recognize that the power retained by the Postmaster General to cancel a star route contract has been enforced by the Supreme Court in Garfielde v. United States, 3 Otto. 242, 93 U.S. 242, 23 L.Ed. 779. There the contractor's proposals followed the advertisement and "instructions attached," which contained a regulation authorizing discontinuance in the public interest. See also Slavens v. United States, 196 U.S. 229, 232, 25 S.Ct. 229, 49 L.Ed. 457, upholding the power to cancel a mail contract containing a clause providing for such a discontinuance as was attempted in the present case. The contract now under consideration did not contain such a clause. We would need more specific words than the uncertainty of § 95.2, supra, that the "general provisions, relating to contract service, Part 97 * * * shall apply, so far as pertinent," to the tubes, to hold that § 97.67(b) controlled this contract. The cancellation related to "public interests," not "contract service." It does not govern this situation. Nor would it govern if no contract had been validly adopted.

2. We now consider the first defense —the nullity of the contract because of the material departure of the contract from the advertised invitation. We

2. The present regulations seemingly do not provide this authority to discontinue contract routes. See 39 CFR (1955 Rev. Ed.) 97. It appears to have been eliminated November 20, 1954, 19 Fed.Reg. 6772, 6996.

3. See Chapman v. Sheridan-Wyoming Co., 338 U.S. 621, 629, 70 S.Ct. 392, 94 L.Ed. 393.

think that the variations, previously listed herein, between the invitation, plaintiff's proposals, and the contract actually signed, demonstrate that the April advertisement could not be treated as a compliance with the essential provisions of 39 U.S.C. (1946 ed.) §§ 423 and 429, 39 U.S.C.A. §§ 423, 429, set out on p. 2, supra. Those sections remained the governing law as to advertising of postal requirements. Neither the Act of 1948, 62 Stat. 1163,[4] nor of 1950, 64 Stat. 1118, made any change. After the 1950 Act the statutory requirements for advertisements were the same as before its passage. The 1950 Act, § 2,[5] as theretofore, made the newly authorized contract "subject to the provisions of laws relating to the letting of mail contracts."

 The authority of an officer to enter into a contract binding the United States must be found in some legally enacted provision of law. That rule has been long recognized. In re Floyd Acceptances, 7 Wall. 666, 19 L.Ed. 169; see Hooe v. United States, 218 U.S. 322, 334, 31 S.Ct. 85, 54 L.Ed. 1055; Eastern Extension Australasia & China Tel. Co. v. United States, 251 U.S. 355, 363, 40 S.Ct. 168, 64 L.Ed. 305; United States v. Goltra, 312 U.S. 203, 208, 61 S.Ct. 487, 85 L.Ed. 776; Fries v. United States, 6 Cir., 170 F.2d 726, 730. When the statutes on contracts for the carriage of the mails call for prior advertisement, the execution of a contract without such advertisement is invalid. Cf. United States v. Ellicott, 223 U.S. 524, 543,[6] 32 S.Ct. 334, 56 L.Ed. 535.

If this contract had been drawn in accordance with the April 1950 advertised requirements for proposals, it may be that a second advertisement under the December 1950 Act would be unnecessary even though it called for compliance with the laws relating to letting mail contracts obviously including those imposing advertisement. 64 Stat. 1118. It was unlikely that any other bidder would compete, as there was no other tube system. A second advertisement was thought by the Attorney General to be unnecessary in a case where former bids, after advertisement, met the requirements of the advertisement.[7] Here there was no attempt to meet the terms of the advertisement. The contractor secured material modifications by negotiation. The Postmaster General did not rely on a rule of necessity to maintain postal functions. Cf. 41 U.S.C. § 5, 41 U.S.C.A. § 5. There is no indication of exigency. Trucks were used in 1953. United States v. Speed, 8 Wall. 77, 83, 19 L.Ed. 449. Nothing appears to indicate the use of the system could not have been extended for the time necessary to advertise. The history of the 1950 Act does not show any direction by or intention of Congress to have this contract executed by the Postmaster General, without complying with previous provisions for advertisement. In fact his request for legislation

---

4. It merely amended the Acts of 1902, 1908, and 1922 by increasing the limitation on payments per mile. S.Rep. No. 1241, 80th Cong., 2d Sess.; H.R.Rep. No. 2093 and No. 2431, 80th Cong., 2d Sess.

5. "Sec. 2. Contracts for the transmission of mail by penumatic tubes or other mechanical devices shall be subject to the provisions of laws relating to the letting of mail contracts, except as otherwise provided in this Act."

6. This was a case where the offer of the contractor set at naught the provisions of the specifications. If that were allowed, the Court said the contract would be "so irresponsive to and destructive of the advertised proposals as to nullify them, and therefore cause it to result that the contract was one made without competitive bidding which was necessary to give it validity."

7. "The conclusion that, as matter of law, the bids thus obtained must be rejected and the whole thing done over again, merely because, at the time the bids were received, there was no specific provision of law authorizing the making of the contract contemplated, is not required or justified by any statute or by any fundamental principle of law." 36 Op.Atty. Gen. 33, 38.

and the Act really changed nothing except the limit on rent per mile.[8]

■ It need hardly be said that the general requirements of advertising for government contracts is a true rule of necessity to avoid the dangers of overpricing goods or services, with the accompanying dangers of corruption in a governmental organization. Variations from that requirement should be and are limited. Cf. 10 U.S.C. § 2304, 10 U.S. C.A. § 2304; see Report on Study of Armed Services Procurement Act, June 15, 1957. Here, although there was and is no suggestion of improper influence or unfair dealing, we conclude that the failure to meet by this contract the advertisement for proposals or to advertise again under the new Act makes the contract of 1950 invalid.

■■ 3. The next problem is what effect such invalidity has upon the services rendered by plaintiff and the expenses incurred by it on account of its undertaking. When the United States contracts, its rights and liabilities are the same as those of an individual, except it cannot be sued without its consent.[9] When an individual or the Government rescinds a contract, the parties are to be placed, as far as possible, in the position they would have occupied without the transaction.[10] So, in United States v. Bethlehem Steel Co., 258 U.S. 321, 42 S. Ct. 334, 66 L.Ed. 639, a contract implied in fact rather than a tortious use of a patent was found. In Clark v. United States, 95 U.S. 539, 542, 24 L.Ed. 518, the Supreme Court said this of an invalid parol contract:

"We do not mean to say that, where a parol contract has been wholly or partially executed and performed on one side, the party performing will not be entitled to recover the fair value of his property or services. On the contrary, we think that he will be entitled to recover such value as upon an implied contract for a *quantum meruit*."

Here, as there was *bona fide* purpose to render services to the United States, as agreed to by the Postmaster General, we think the parties should be put substantially in the position they would have occupied without the attempted contract rather than a strict *quantum meruit*.

4. Our application of that conclusion leads to this.

■ Plaintiff has been paid under the contract for services performed through December 31, 1953, except for December expenses. These payments it should retain. Plaintiff should recover its December expenses of $27,960.94, its January 1954 expenses of $6,241.69, its special franchise taxes for the second half of the 1953–54 tax year, $12,792.18. In our opinion, since the cost of electric power conversion was due solely to the requirements of the contract, the Government should reimburse that expense in accordance with the terms of the contract, i. e., $141,564.47. Plaintiff should also recover for the same reason the cost of the new set of carriers purchased for use on the system, $27,551.52. As the removal of equipment from Government-owned stations would have been necessary whether or not the contract had been made, that claim is denied.

The counter-claims of the United States are dismissed.

It is so ordered.

LARAMORE and WHITAKER, Judges, concur.

---

8. 64 Stat. 1118; S.Rep. No. 2500, 81st Cong., 2d Sess.; H.R.Rep. No. 3144, 81st Cong., 2d Sess.

9. Perry v. United States, 294 U.S. 330, 352, 55 S.Ct. 432, 79 L.Ed. 912; In re Floyd Acceptances, 7 Wall. 666, 675, 19 L. Ed. 169; Clearfield Trust Co. v. United States, 318 U.S. 363, 369, 63 S.Ct. 573, 87 L.Ed. 838; United States v. Standard Rice Co., 323 U.S. 106, 65 S.Ct. 145, 89 L.Ed. 104.

10. Neblett v. Macfarland, 92 U.S. 101, 103, 23 L.Ed. 471. Cf. Pan American Petroleum & Transport Co. v. United States, 273 U.S. 456, 505, 47 S.Ct. 416, 71 L.Ed. 734. But see Schneider v. United States, 19 Ct.Cl. 547, 551.

LITTLETON, Judge (dissenting).

I agree with the opinion of the majority that section 97.67(b) of the postal laws and regulations did not give the Postmaster General the right to cancel the contract in suit. I disagree with the holding of the majority that the contract between the Postmaster General and the plaintiff was invalid for lack of authority because the terms contained therein were not advertised to invite competitive bidding.

The sense of the majority opinion, as I understand it, seems to me to be this: (1) the Postmaster General was required to advertise the terms of the contract in suit for the transmission of mail in New York City by pneumatic tube or other mechanical device by reason of (a) 39 U.S.C. § 429, 39 U.S.C.A. § 429, (b) by the pneumatic-tube statute in effect at the time of the purported advertisement in April 1950 (39 U.S.C. § 423, 39 U.S.C.A. § 423), (c) by the pneumatic-tube statute enacted on December 27, 1950 (64 Stat. 1118), and (d) by R.S. § 3709, 41 U.S.C.A. § 5, the general statute covering the necessity for advertising government contracts; (2) because the terms contained in the December 29, 1950 contract with plaintiff differed materially from the terms advertised on April 24, 1950, it follows that the contract with plaintiff was never advertised by the Postmaster General; (3) because the December 1950 contract with plaintiff was not advertised, it is invalid as having been entered into by the Postmaster General without authority and contrary to the above four laws; and (4) although the contract is invalid because unauthorized and contrary to law, plaintiff may recover the value of its services because the record in the case establishes a bona fide purpose on the part of plaintiff to render service to the United States and on the part of the United States to receive and pay for such service.

I am of the opinion that (1) under the facts and circumstances of this case, the four statutes cited by the majority did *not* require the Postmaster General to advertise the contract in suit; (2) that the contract in suit was fully authorized and valid, and (3) that the plaintiff is entitled to recover all sums due plaintiff under the terms of the contract at the time of its cancellation and also a sum representing the difference between the contract price and the operating expenses which plaintiff did not have to meet by reason of the fact that it did not have to render performance for the remaining seven years of the 10-year contract term.

Were I to agree with the holding of the majority that the December 29, 1950 contract was invalid for lack of authority in the Postmaster General, I would be unable to agree with the conclusion reached by the majority that plaintiff is entitled to any recovery at all. I have always understood the general rule to be that lack of contracting authority in a Government agent renders unenforceable against the Government a contract made by such agent, whether that contract is express or implied in fact. Hooe v. United States, 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055; United States v. North American Transportation & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935; Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099; Baltimore & Ohio R. Co. v. United States, 21 U.S. 385, 43 S.Ct. 384, 67 L.Ed. 711. However, the courts have been reluctant to hold that a Government agent lacks authority to perform an act or to enter into a contract, in the absence of a clear statutory prohibition or limitation. See International Paper Co. v. United States, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410; Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 330, 43 S.Ct. 135, 67 L.Ed. 287; Winn-Senter Construction Co. v. United States, 75 F.Supp. 255, 110 Ct.Cl. 34; Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; Whike Construction Co. v. United States, 140 F.Supp. 560, 135 Ct.Cl. 126. I see no justification in the facts of the instant case or in the applicable law for finding or implying any lack of authority

in the Postmaster General to negotiate for the contract in suit.

Four provisions of law are cited by the majority as requiring the Postmaster General to advertise the contract in suit. For the purposes of discussion I shall set forth below the pertinent provisions of the four statutes. For reasons which I shall discuss in some detail hereinafter, I am of the opinion that 39 U.S.C. § 429, 39 U.S.C.A. § 429, is not a provision of law requiring advertising, and that under the facts and circumstances of this case, none of the other three statutes set forth below required that this particular contract with plaintiff be advertised.

(1) 39 U.S.C. § 429, 39 U.S.C.A. § 429, provides for the *awarding* of mail contracts, which have been advertised, to the lowest responsible bidder, as follows:

"All contracts for carrying the mail shall be in the name of the United States *and shall be awarded* to the lowest responsible bidder tendering sufficient guaranties for faithful performance in accordance with the terms to the advertisement. Such contracts shall require due celerity, certainty, and security in the performance of the service; but the Postmaster General shall not be bound to consider the bid of any person who has willfully or negligently failed to perform a former contract." [Italics supplied.]

(2) The statute authorizing the Postmaster General to enter into contracts for the transmission of mail by pneumatic tubes or other mechanical devices, 39 U.S.C. § 423, 39 U.S.C.A. § 423, as that law stood prior to the December 27, 1950 amendment, provided as follows:

"The Postmaster General may enter into contracts * * * for the transmission of mail by pneumatic tubes or other similar devices for a period not exceeding ten years, *after public advertisement once a week for a period of six consecutive weeks in not less than five newspapers, one of which shall be published in each city where the service is to be per-*

*formed.* Contracts for this service shall be subject to the provisions of the postal laws and regulations relating to the letting of mail contracts, *except as herein otherwise provided, and no advertisement shall issue until after a careful investigation shall have been made as to the needs and practicability of such service and until a favorable report, in writing, shall have been submitted to the Postmaster General by a commission of not less than three expert postal officials, to be named by him; nor shall such advertisement issue until in the judgment of the Postmaster General the needs of the Postal Service are such as to justify the expenditure involved. Advertisements shall state in general terms only the requirements of the service and in form best calculated to invite competitive bidding.*

"The Postmaster General shall have the right to reject any and all bids; *no contract shall be awarded except to the lowest responsible bidder, tendering full and sufficient guaranties to the satisfaction of the Postmaster General, of his ability to perform satisfactory service,* and such guaranties shall include an approval bond in double the amount of the bid." [Italics supplied.]

(3) The pneumatic-tube contract statute which was in effect on the date the contract in suit was executed was the Act of December 27, 1950, 64 Stat. 1118, and it contained the following provisions with respect to advertisement:

" * * * the Postmaster General may enter into contracts for terms not exceeding ten years, for the transmission of mail by pneumatic tubes or other mechanical devices.

"Sec. 2. Contracts for the transmission of mail by pneumatic tubes or other mechanical devices shall be subject to the provisions of laws relating to the letting of mail contracts, except as otherwise provided in this Act. *Advertisements shall state in general terms only the re-*

*quirements of the service and shall be in the form best calculated to invite competitive bidding.* The Postmaster General may reject any and all bids. *No contract shall be awarded except to the lowest responsible bidder tendering full and sufficient guaranties to the satisfaction of the Postmaster General of his ability to perform satisfactory service."* [Italics supplied.]

(4) R.S. 3709, as amended, 60 Stat. 809, 41 U.S.C. § 5, (1946 Ed.), 41 U.S.C.A. § 5, which is the general statute relative to the advertising of Government contracts, provides in pertinent part as follows:

"*Unless otherwise provided* in the appropriation concerned or other law, purchases and contracts for supplies or services for the Government may be made or entered into only after advertising a sufficient time previously for proposals, except (1) when the amount involved in any one case does not exceed * * * (2) when the public exigencies require the immediate delivery of the articles or performance of the service, (3) when only one source of supply is available and the Government purchasing or contracting officer shall *so certify,* * * *." [Italics supplied.]

With reference to the first statute set forth above (39 U.S.C. § 429, 39 U.S.C.A. § 429), I note that the majority characterizes that law as one of the "governing law[s] as to advertising of postal requirements." I am of the opinion that the provision in question does not require the *advertising* of postal contracts, but rather requires the Postmaster General to *award general mail letting contracts, which some other porvision of the postal laws requires to be advertised,* to the lowest responsible bidder who tenders sufficient guaranties for faithful performance of the service desired, in accordance with the terms of the required advertisement. The postal law requirement for the *advertising of general mail lettings* is found in 39 U.S.C.

§ 421, 39 U.S.C.A. § 421, and I think that 39 U.S.C. § 429, 39 U.S.C.A. § 429, has reference only to the *award* of general mail lettings which were required to be advertised, and had been advertised, under section 421 of the postal laws.

The contract with this plaintiff did not involve a general mail letting, and I do not think that 39 U.S.C. §§ 421 or 429, 39 U.S.C.A. §§ 421 or 429, have any bearing on the issues of (1) whether the Postmaster General was required to *advertise,* or (2) whether the Postmaster General had authority to *award* the contract in suit without prior advertising. I think that we should look first to the specific statute under which the Postmaster General purported to act when he contracted with this plaintiff on December 29, 1950, and from that statute determine the extent of, and the limitations on, his authority to contract at that time for the transmission of mail in New York City by pneumatic tube.

At the time the contract in suit was advertised in April 1950, the pneumatic-tube statute then in effect did not require the Postmaster General to *award* the contract to the lowest responsible bidder tendering guaranties of faithful performance "in accordance with the terms of the advertisement." On the contrary, the pneumatic-tube statute merely stated that the Postmaster General should not award a contract to any but the lowest responsible bidder tendering full and sufficient guaranties *"to the satisfaction of the Postmaster General of his ability to perform satisfactory service".* Nothing in that pneumatic-tube statute limited the Postmaster General's contracting authority to a bidder who guaranteed performance *in accordance with the terms of an advertisement.*

But the majority suggests that because the pneumatic-tube statute in effect at the time of the advertisement in April 1950, and prior to the date of execution of the contract, provided that the Postmaster General might enter into contracts for the transmission of mail by pneumatic tube "after public advertisement," a contract executed by the Post-

master General which contained terms that had not been publicly advertised was not the sort of contract permitted by the statute, and was beyond the authority of the Postmaster General under that statute. Although I agree with Judge Madden that the pneumatic-tube law in effect prior to December 27, 1950, has no real bearing on the issues of this case, I am of the opinion that if the prior law has any effect it did not require the Postmaster General to issue a new advertisement covering the terms negotiated by the parties, which terms were different from those contained in the April 1950 advertisement. The prior pneumatic-tube law which was in existence at the time of the April advertisement, provided that the advertisement state *in general terms only* the requirements of the service for which the Postmaster General desired to contract. The issuance of the advertisement published by the Postmaster General in April 1950 complied in every respect with each provision of the pneumatic-tube law then in effect except that the terms of that advertisement were not general but, on the contrary, were extremely detailed. In my opinion, when a law requires advertisement in general terms only, it is the intention of the lawmakers to leave the detailed provisions of the contract open to negotiation by the authorized representative of the Government, particularly where that law does *not* require that the contract be awarded to the lowest bidder guaranteeing performance in accordance with the terms of the advertisement. That such was the intention of Congress in enacting the pneumatic-tube statute is demonstrated by the fact that in that statute the Postmaster General was not required to award a contract to the bidder who guaranteed performance in accordance with the terms of the advertisement as he would have been required to do in the case of a general mail letting contract under sections 421 and 429 of the postal laws. Accordingly, I am of the opinion that if the contract which was executed in December 1950 had contained general

terms which were responsive to the general terms advertised, and detailed terms which had been negotiated between the parties, and all the terms had been within the limits of the pneumatic-tube statute then applicable, the contract would have been fully authorized and valid.

What actually happened in this case is that the parties could not execute a contract containing certain detailed provisions desired by both parties because provisions in the existing pneumatic-tube statute did not permit the Postmaster General to agree to such terms. In general, the terms which the parties wished to incorporate in the contract and which were contrary to the existing pneumatic-tube law, had to do with the amount of compensation the Postmaster General might commit the Government to pay for the service desired. Existing pneumatic-tube law contained a ceiling of $12,000 on the rate per mile payable in New York City, and the law also provided that contracts for pneumatic-tube service were subject to annual appropriation acts for the Post Office Department. Both of these limitations had to be removed by Congress before the contract which plaintiff and the Postmaster General had agreed upon could be executed. Accordingly, the Postmaster General asked Congress to enact new pneumatic-tube legislation raising the compensation rate per mile ceiling in New York City for 10 years from $12,000 to $15,500, and eliminating the provision in existing law that contracts for pneumatic-tube service in New York City be subject to annual appropriations for the Post Office Department. The Postmaster General was willing that the $15,500 ceiling applicable to New York should revert to the $12,000 ceiling at the expiration of the 10-year contract which he had negotiated with plaintiff. In the law which was enacted on December 27, 1950, Congress did both of these things.

Following the passage of the December 27, 1950 pneumatic-tube statute, the Postmaster General and plaintiff executed the 10-year contract in suit. That contract contained many of the general

provisions which had been advertised on April 24, 1950. It also contained terms as to payment and certain detailed terms regarding cancellation which had not been advertised on April 24, 1950, but which terms had been negotiated by the parties during the months following the April 24, 1950 advertisement. Although none of the terms of the December 29, 1950 contract were in conflict with the law which was in existence on that date, the majority holds that the contract executed by plaintiff and the Postmaster General *pursuant to that law* was unauthorized and invalid because of the failure of the Postmaster General to issue a new advertisement containing terms which had not been previously advertised but which had been arrived at through negotiation.

The majority opinion states categorically that the December 27, 1950 pneumatic-tube statute did nothing to change the advertising requirements which had been expressed in the prior pneumatic-tube statute, and, that if advertising was required under that prior law, it was equally required by the terms of the new statute enacted just before the contract in suit was executed. In my opinion, the December 27, 1950 pneumatic-tube statute *made very material changes in the advertising requirements which had been contained in the prior law.* The first, and perhaps the most important difference in the two pneumatic-tube statutes relative to advertising, is shown by the fact that the earlier law authorized the Postmaster General to enter into pneumatic-tube contracts *"after public advertisement."* The December 27, 1950 statute contained no such provision. The other changes in the advertising provisions of the earlier law follow logically from the omission in the 1950 statute of the requirement that contracts be entered into after public advertisement. The pneumatic-tube statute in effect prior to December 27, 1950 required (1) that before an advertisement could be made, the Postmaster General must secure a favorable report on the necessity for pneumatic-tube service from a com-mission of three postal experts; (2) that following such favorable report, the service must be advertised publicly in general terms once a week for six consecutive weeks in five newspapers, one of which newspapers must be in each city where service was to be performed; (3) that no advertisement at all should issue until in the judgment of the Postmaster General the needs of the Postal Service were such as to justify the expenditure of the sums involved. *None of those provisions were contained in the December 27, 1950 legislation,* and they were omitted, in my opinion, because Congress knew that it was making no positive requirement in such legislation for public advertisement in all circumstances.

Both the repealed and the new pneumatic-tube statutes provided that:

"Advertisements shall state in general terms only the requirements of the service and [shall be] in the form best calculated to invite competitive bidding."

Insofar as the new pneumatic-tube statute is concerned, the above-quoted provision is the only place in the entire statute where the word "advertisement" is used. In my opinion, that provision in the new act should not be interpreted as a positive requirement for advertising, but rather as meaning that if the Postmaster General should decide that advertising was necessary, he should phrase his advertisement in general terms and in a manner best calculated to accomplish the purpose of any advertisement, i. e., to encourage competitive bidding. I am of the opinion that Congress was thinking of contracts for pneumatic-tube service in cities other than New York City when it enacted the above-quoted provision, and I think such an interpretation is justified by the legislative history of the 1950 act which I shall discuss later herein.

I now come to the question whether or not the Postmaster General was free to decide, in each case and without any statutory limitation whatsoever, whether or not he would advertise for bids in connection with a pneumatic-tube mail

transmission contract under the 1950 act. I think it is clear that the 1950 act did not expressly require the Postmaster General to advertise for bids, and, as pointed out earlier herein, I do not consider section 429 of the postal laws to be a requirement for advertising. I am of the opinion, however, that R.S. § 3709 relating to the general law of advertising government contracts *was* binding upon the Postmaster General in connection with *any* contract he might wish to make for the transmission of mail by pneumatic tube in New York City or elsewhere.[11]

I agree with the majority that the general advertising requirements of R.S. § 3709 represent a rule of necessity designed to secure for the Government the best possible services at the lowest possible prices by inviting open, active competition. R.S. § 3709 provides that, *unless otherwise provided by law*, contracts for supplies or services for the Government may be entered into only after advertising a sufficient time previously except in certain specified instances. The 1950 pneumatic-tube statute did not expressly "otherwise" provide. In fact, that statute was very nearly silent on the subject of advertising, and the courts and the Attorney General have held that the Postmaster General is bound by the provisions of R.S. § 3709 in the absence of specific postal legislation to the contrary. Presumably Congress was aware of this fact when it enacted the 1950 pneumatic-tube statute without including therein any positive provision requiring advertising. Accordingly, unless the facts of this case establish that it falls within one of the exceptions provided in R.S. § 3709, I am of the opinion that the Postmaster General was required to advertise the contract in suit, many of the important terms of which were never advertised for public competitive bidding.[12]

In my opinion, the facts and circumstances of the instant case, as revealed by the findings of the court, establish that one, and possibly two, of the exceptions provided for in R.S. § 3709 existed to relieve the Postmaster General of the legal necessity for advertising this contract.

The strongest case has been made for the exception which provides as follows:

"(3) when only one source of supply is available and the Government purchasing or contracting officer shall so certify, * * *"

The above exception contains two elements: (1) that only one source of supply is available, and (2) that the Government contracting officer shall so certify.

As to whether or not there was but one source of supply in this case, the record establishes conclusively and the court has found as a fact, that there was only one source in New York City from which the Postmaster General might secure the transmission of the mails by pneumatic tube or other mechanical device, and that source of service was the plaintiff company. For many years prior to the execution of the contract in suit, the Postmaster General had contracted with plaintiff and its predecessors in interest as the owners of the one and only pneumatic-tube mail transmission system in existence in New York City. By the time of this contract, many miles of tube had been installed connecting twenty-two Government post offices in the city. Although the mails could have been transmitted in New York by means other than by pneumatic tube, and, in fact, a substantial portion of New York

11. The 1950 act provided that contracts covered by that act should be subject to the provisions of law relating to the letting of mail contracts. R.S. § 3709 applies to the advertising of mail contracts unless some other law provides otherwise. I think there was no other law applicable to this contract.

12. In support of the proposition that a contract which by law is required to be advertised, is invalid if not advertised, the majority cites the case of United States v. Ellicott, 223 U.S. 524, 32 S. Ct. 334, 56 L.Ed. 535. As I understand the holding in that case, the Supreme Court held that the contract in suit was void for uncertainty rather than for lack of advertising or lack of authority.

City mails had for years been transported by truck, Congress had by law given to the Postmaster General the authority to enter into contracts for the transmission of mail by pneumatic tube if, in the opinion of the Postmaster General, the needs of the postal service justified the use of that means of transportation and the expense involved in employing such means. Where, as here, competitive bidding for the service desired was an utter impossibility, and where the Government contracting officer was vested with full authority to contract for the desired service, both reason and the express terms of R.S. § 3709 impel one to the conclusion that a valid and legal contract with the one firm equipped to furnish the service may be *negotiated* without resort to the needless expense of advertising to invite nonexistent competition.

I am under the distinct impression that the majority has been influenced by the fact that the Postmaster General may have acted unwisely in deciding to continue the use of pneumatic tubes for the transmission of mail in New York City in 1950. The various pneumatic-tube statutes in effect prior to December 27, 1950, contained certain limitations on the discretion vested in the Postmaster General which were not included in the 1950 statute. One of those limitations was that before the Postmaster General could advertise for bids for such service he must secure a favorable report from a commission of three postal experts on the necessity and desirability of such a service. Before making the April 24, 1950 advertisement, the Postmaster General did secure such a favorable report and, accordingly, I am of the opinion that he scrupulously complied with all of the provisions of the pneumatic-tube law as it then existed. It is true that the commission of postal experts which had rendered the favorable report, later, on two separate occasions, rendered supplemental reports indicating that because of recent improvements in the facilities of the mail trucking service in New York City, the mails might be more economically transported by motor truck than by pneumatic tube. These supplemental reports were rendered to the Assistant Postmaster General who transmitted them to the Postmaster General for his information. However, I am of the opinion that once the commission of postal experts had rendered its statutory report and the Postmaster General had acted upon it by advertising the contract in April 1950, that commission was *functus officio*, and its subsequent actions and reports could not, as a matter of law, have any binding effect on the Postmaster General. After receiving the favorable report of the commission, the Postmaster General arrived at the determination required of him by the statute then in effect, that in his judgment the needs of the postal service justified the expenditure which would be involved in executing a new contract for the transmission of the mails in New York City by pneumatic tube; and upon receiving the supplemental adverse reports after the April 1950 advertisement had issued, the Postmaster General continued to be of the same opinion, and so certified to Congress that this contract with plaintiff should be negotiated.

From the point of view of hindsight, this court may believe that the Postmaster General acted unwisely in not heeding the adverse supplemental reports of the commission and in not rejecting plaintiff's bid. But the decision to secure the type of service here involved was by statute committed to the discretion of the Postmaster General and not to the Federal courts. If that discretion was exercised within the limitations imposed by applicable law, as it was in this case, and if the contract ultimately executed was in conformity with the law in existence at the time of such execution, as this one was, then I am of the opinion that there is nothing the courts can or should do about the contract except enforce it. The various comments contained in the majority opinion concerning the availability of trucks to deliver the mails in New York City, the fact that the Postmaster General *might* have se-

cured a short extension of the current pneumatic-tube contract for a period beyond December 31, 1950, sufficient to permit a new advertisement to issue or to permit a further investigation into the wisdom of abandoning completely that system, and the suggestion that mail delivery in New York City would not have broken down entirely if delivery of the mail by pneumatic tube had ceased on December 31, 1950, are all matters which I consider to be beyond the legitimate or proper consideration of this court and to have no bearing on the issue of whether or not the Postmaster General acted beyond the authority vested in him by the Act of December 27, 1950.

In connection with the above-mentioned suggestions of the majority as to what the Postmaster General might and perhaps should have done, the case of United States v. Speed, 8 Wall. 77, 83, 19 L.Ed. 449, is cited. I am somewhat at a loss to understand the purpose for which the Speed case is cited since in my opinion the holding of the Court in that case is quite favorable to plaintiff herein. In the Speed case, the Government, appealing from a judgment for plaintiff in the Court of Claims, urged that the contract in suit was unenforceable and not binding upon the United States because no advertisement for proposals to contract had been issued as required by the Act of March 2, 1861, 12 Stat. 220. The Supreme Court held that while the statute in question required advertisement as a general rule, it also

"* * * invests the officer charged with the duty of procuring supplies or services with a discretion to dispense with advertising, if the exigencies of the public service require immediate delivery or performance.

"*It is too well settled to admit of dispute at this day, that where there is a discretion of this kind conferred on an officer, or board of officers, and a contract is made in which they have exercised that discretion, the validity of the contract*

*cannot be made to depend on the degree of wisdom or skill which may have accompanied its exercise.*" [Italics supplied.]

In the instant case, the fact that trucks might have been used more economically than pneumatic tubes for the transmission of mail in New York City, is a fact which reflects on the degree of wisdom or skill accompanying the exercise of the discretion lodged in the Postmaster General by the pneumatic-tube law and by the general advertising statute, and the validity of the contract he entered into is not dependent on the degree of wisdom or skill which he exercised.

Since the 1950 act did not contain an affirmative and positive requirement that the Postmaster must advertise for bids to furnish pneumatic-tube service in New York City, and since the general advertising statute (R.S. § 3709) provided an exception to the necessity for advertising in the case where there exists but one supplier for the service desired, I am of the opinion that the Postmaster General acted entirely within the grant of authority contained in the 1950 act and within the provisions of R.S. § 3709 when he executed the contract in suit without advertising the terms therein which had not been been previously advertised.

But the opinion of the majority holds that even though the contract in suit may not have been required to be advertised, once it was advertised in April 1950, the Postmaster General was prohibited by law from awarding a contract which contained terms different from those advertised. In other words, by issuing the advertisement for contract services in a situation where, under R.S. § 3709, he was not required to advertise, the Postmaster General lost the benefit of the exceptions contained in R.S. § 3709 and thereafter was required to proceed as though he had been required to issue the advertisement in the first place. This would mean, that having needlessly advertised for bids, the Postmaster General could only award a contract on terms which were identical with the terms in

that needless advertisement, and if he entered into a contract whose terms varied materially from the terms needlessly advertised, that contract is void and unenforceable for lack of authority, unless he makes another useless advertisement of such new terms. I am unable to agree with such a proposition and I do not think that the opinion of the Attorney General reported at 36 Op.Atty.Gen. 33, cited in the majority opinion, lends any support to that holding. In the case presented to the Attorney General, the Postmaster General advertised for proposals for the transmission of the mail by aircraft on a certain route from the Canal Zone to points in South America and return. The advertisement for bids specified a price basis and a route not authorized by existing law. Five companies submitted proposals. Subsequently, at the request of the Postmaster General, Congress enacted new legislation which permitted the Postmaster General to contract for the new route and at the higher rates previously advertised. Thereafter, the Postmaster General awarded the contract to the lowest bidder of the five who had submitted bids prior to the enactment of the new legislation. One of the unsuccessful bidders protested the award on the ground that the contract awarded was void because, at the time the bids were invited and received, there was in effect no statute which authorized the Postmaster General to make the contract contemplated by the advertisement. The Attorney General observed that there was, at the time of the advertisement, no statute of *general application* which prescribed any particular method to be followed in inviting bids for postal delivery except R.S. § 3951, 39 U.S.C.A. § 434, relating to "general mail lettings," and he was of the opinion that a contract for the transportation of mail by aircraft was not a "general mail letting." He noted that the pneumatic-tube statute then in existence prescribed the precise manner in which advertisements for that service should be made and that the statute authorizing contracts for transportation

of the mail by aircraft did not mention the manner of advertising. The Attorney General concluded that R.S. § 3709 rather than the general mail letting statute was applicable to such contracts. Conceding that R.S. § 3709 required the airmail contract to be advertised and that the advertisement which issued contained terms not then sanctioned by law, the Attorney General held that the purpose of R.S. § 3709 was accomplished if competitive bidding had not been actually discouraged by the Postmaster General. The Attorney General also stated that he could readily conceive of a case where uncertainty in ultimately obtaining statutory authority for the terms advertised might be great, and that the expense to bidders of making bids or putting themselves in a position to perform the contract would be so great that the possibility that a contract might never be awarded through lack of statutory authority, would seriously restrict competition. The Attorney General found, however, that in the case under his consideration, there appeared to be no circumstances which would justify the conclusion that "responsible concerns *equipped* to perform the contract were deterred from entering the competition by any uncertainty as to whether statutory authority would be obtained."

I cannot agree with the statement of the majority herein that the Attorney General in the above opinion based his conclusion as to the validity of the aircraft transportation contract on the fact that the bids had been responsive to the terms of the advertisement. I think he based his conclusion that the contract was valid on his finding that no qualified and responsible bidder was deterred from entering the competition within the meaning of R.S. § 3709 under the facts and circumstances of that case. And I think that in the instant case, the facts and circumstances show even more clearly that no responsible or qualified concern was prevented from entering the competition to render the service sought by the Postmaster General because of the failure of the Postmaster General to ad-

vertise the terms ultimately incorporated in the December 29, 1950 contract with plaintiff herein.

I now come to the second element of exception (3) of R.S. § 3709, i. e., that the fact of only one source of supply *be certified by the Government contracting officer.* The statute does not say what form that certification must take nor to whom it must be made, and we are accordingly at liberty to place a reasonable construction on the language used in the statute. If the contract in suit had been negotiated by an inferior official of the Post Office Department, I suppose that official would have had to certify the fact of "one source of supply" to the Postmaster General as the head of the department. But the Government contracting officer in this case was the Postmaster General himself. From the outset, he appears to have handled all the negotiations personally, and I would think that in executing the contract on December 29, 1950, without advertising the new terms therein, his very act of such execution amounted to a certification by him that to the best of his knowledge the plaintiff was the only source of supply for the service which was the subject matter of the contract. Since the contracting officer in this case was the head of the department, I can think of no one to whom he might make such a certification unless he made it to Congress, from which body his authority to contract emanated. In my opinion, the Postmaster General did make such a certification to Congress in his identical letters to the Speaker of the House and to the Vice President, asking for legislation to permit him to enter into this very contract. If the Postmaster General had not required new legislation, a simple written statement that there was only one source of supply, placed in the files of the Post Office Department, would have been a sufficient compliance with exception (3) above.

The legislative history of the December 27, 1950 statute shows that the Postmaster General had advised Congress of his wish to enter into a contract for the transmission of mail in New York City with the New York Mail and Newspaper Transportation Company, the plaintiff herein, and that unless the legislation which he·was requesting were enacted before the current contract expired on December 31, 1950, there would be a cessation of mail service to that extent in New York City.

I am of the opinion that the legislative history which I am about to discuss not only indicates that the Postmaster General certified to Congress that there was only one concern qualified to render pneumatic-tube service in New York City, but also that Congress by enacting the 1950 act intended that the contract between the Postmaster General and this plaintiff might be executed *without previous advertising.*

The following statement appears in House Report No. 3144, dated December 5, 1950, 81st Congress, 2d Session, page 4261, on S. 4102 which became the Act of December 27, 1950:

"This bill will permit the Postmaster General to enter into contracts for terms of not to exceed 10 years (the terms now authorized by law), for the transmission of mails by pneumatic tubes or other mechanical devices. The maximum per annum rate authorized to be paid for such service at *New York* would be increased from not to exceed $12,000 per mile to not to exceed $15,500 per mile for a period of 10 years, after which time the annual rate of expenditures per mile shall not exceed $12,000.

"The *owners of the pneumatic tube system in New York City* must convert the system from nonstandard direct current to standard alternating current. The source of power supply, the Consolidated Edison Co. of New York, Inc., has requested *that it be advised on or before December 31, 1950,* whether or not the power machinery operating the pneumatic tube system will be converted to the use of alternating current. *If this concern is notified that*

*the conversion will be made,* then it will continue to supply nonstandard direct current for a reasonable length of time in order to permit the work of making the conversion to be completed.

"The exact cost of the conversion cannot be determined accurately without detailed field investigation, but it is estimated that the conversion cost will approximate $300,000. *The owners of the tube system operating in the city of New York, the New York Mail and Newspaper Transportation Co.,* cannot absorb the expense of making the conversion of the machinery, pay operating and maintenance expenses and obtain a fair profit on its capital outlay at the existing statutory rate of pay, namely, $12,000 per mile.

"The per annum rate paid *at other cities* for the transmission of mails by pneumatic tubes will be at the most favorable rates obtainable, subject to amounts appropriated therefor by Congress.

"The bill also clarifies existing law with respect to such pneumatic tube contracts. These contracts expire December 31, 1950, and *expeditious action* on this legislation is required in order that its terms may be utilized *in negotiations for the new contract.*

" * * * The legislation has the approval of the Bureau of the Budget and was introduced at the request of the Post Office Department." [Italics supplied.]

The statement quoted above was followed in the report by the letter of August 25, 1950, from the Postmaster General to the Speaker of the House, urging that the proposed legislation be enacted during the present session of Congress because the existing contract would expire on December 31, 1950.

When, on September 13, 1950, the bill was brought up on the floor of the Senate for a vote, Senator Humphrey stated that unless the bill was passed, the entire transmission of mail by pneumatic tube in the Manhattan district and the general New York area would be interrupted and severely damaged. In answer to a question concerning the increased cost under the bill, Senator Humphrey stated that the bill had been adopted unanimously by the Senate Committee which had understood that it was imperative that the bill be passed quickly. He stated at page 14665 of the Congressional Record, Vol. 96, Part 11:

" * * * That is why I, as the chairman of the subcommittee, introduced it, in order to carry on *the mail service in the New York area.*

"Mr. Langer. Can the Senator tell us the total amount *the company* is receiving from the Government? [meaning the plaintiff company supplying service in New York].

"Mr. Humphrey. I do not recall that we have that figure. I will check the report. Yes; the last figure we have is $513,911.50, which includes power, labor, and all operating expenses.

"Mr. Langer. That is more than half a million dollars for New York City alone.

"Mr. Humphrey. For the transmission of the mail by pneumatic tube and other mechanical devices; that is correct.

"Mr. Langer. Does not the Senator from Minnesota think that amount is a little bit high?

"Mr. Humphrey. The Senator from Minnesota acted only upon the information we had from the Post Office Department *and on the urgency of the request,* I could not help but feel that since it was a very technical subject, about which I knew very little, the only advice to follow would be that of the Postmaster General, who seems to be doing a job of economizing in the Post Office Department. I did not think he would go overboard in his recommendation." [Italics supplied.]

In the Report (No. 2500) of the Senate, rendered September 1, 1950, 81st Congress, 2d Session, it is noted that the Comptroller General had called to the committee's attention the fact that in cities *other than New York City*,[13] the per mile per annum ceilings in existing law were *removed entirely* by the proposed legislation. The report then stated that with respect to the removal of the existing price ceiling in *cities other than New York*, the proposed law (act of 1950) contained sufficient requirements "as to competitive bidding."

In my opinion the above described legislative history of the December 27, 1950 act indicates that Congress knew, *upon certification by the Postmaster General*, that in the City of New York there was but one source of supply for transmission of the mails by pneumatic tube and that such source of supply was the New York Mail and Newspaper Transportation Company. This history also makes it plain that one of the primary purposes of the 1950 act was to permit the Postmaster General to *negotiate*, without prior advertising, with the New York Mail and Newspaper Transportation Company for a contract to furnish transportation of the mails in New York City for 10 years, beginning on January 1, 1951, on terms not authorized by existing law, among which terms were an increased rate of compensation per mile per annum, and the right to negotiate a contract in New York which would *not be subject* to annual appropriations for the Post Office Department. The committee reports indicate that in cities other than New York, competitive bidding might be possible, and if so, should be invited, and that contracts for pneumatic tube service in such other cities *would* be subject to annual appropriations for the Post Office Department.

From the above it is clear to me that plaintiff has brought its case squarely within the third exception to R.S. § 3709 in that plaintiff was the sole source of

supply for the services required by the Postmaster General, and the Postmaster General so certified to Congress. It is also obvious to me that any positive requirement for advertising that may have existed in the pneumatic-tube statute in effect prior to the Act of December 27, 1950 by virtue of the language therein providing that the Postmaster General was authorized to enter into pneumatic-tube contracts "after public advertisement once a week" etc., was eliminated from the law upon the enactment of the 1950 statute, at least insofar as that law covered pneumatic-tube contracts in New York City, because that new law omitted the language "after public advertisement" and also omitted all other provisions in the prior law relating to the manner of making advertisements. Furthermore, the House Report made specific reference to granting the Postmaster General the authority to *negotiate* a pneumatic tube contract in New York City. As the Senate Report on the 1950 law indicates, the provision in the 1950 law requiring that "no contract shall be awarded except to the lowest responsible bidder tendering full and sufficient guaranties to the satisfaction of the Postmaster General of his ability to perform satisfactory service" was intended to apply to cities other than New York, where the new law imposed no ceiling on the compensation per mile per annum which might be paid for such service.

Finally, the $15,500 rate per mile per annum ceiling authorized by the new law for the New York City contract was understood by Congress, and the 1950 act so provided, to apply only to the New York contract. This ceiling was arrived at on the basis of the proposal made by this plaintiff and was by law authorized only for the 10 years during which plaintiff's contract to be negotiated was intended to run.

I am unable to conceive of a clearer case where advertising by a Government official was *not* required either by the

---

13. The proposed legislation raised the compensation limit in New York but only for a period of 10 years at the expiration of which time the ceiling reverted to the amount contained in the old law.

statute authorizing the particular contract in question (64 Stat. 1118), or by R.S. § 3709 covering the advertisement of Government contracts in general. Since advertising was not necessary, I cannot understand how a contract containing terms, some of which had not been advertised, can be invalid for lack of advertising, or can be said to have been entered into by the Postmaster General without statutory authority and contrary to law.

Although plaintiff need only establish that its case falls within one of the exceptions in R.S. § 3709, the majority suggests that "there is no indication of exigency." (R.S. § 3709(2) ). I am of the opinion that the applicable law vested in the Postmaster General the discretion and sole right of decision to determine whether or not the exigencies of the situation justified his dispensing with advertising. Unless the record in this case indicates that such discretion was exercised dishonestly and in complete disregard of the facts, the decision of the Postmaster General should be considered final regardless of any possible lack of wisdom on his part in exercising that discretion. In the instant case the record, the reports of the congressional committees, the debate in the Senate, and the letters of the Postmaster General, all indicate that the Postmaster General honestly believed, and that Congress was so advised, that there was need for expeditious passage of the requested legislation so that there would be no break in the pneumatic-tube transmission of mail in New York City when the current contract expired on December 31, 1950. The House Report referred to above indicates that the Consolidated Edison Company of New York was asking for a firm commitment by December 31, 1950, that the power machinery used to run the pneumatic-tube system in New York would be converted from nonstandard direct to standard alternating current. It seems obvious that no such commitment could have been made on the basis of a short term interim contract such as that suggested by the majority. The expense involved in the required conver-

sion could only be justified if the new contract was to last for 10 years. The contract which had been negotiated by the parties provided that the cost of such conversion would be borne by the Government and would be amortized over the entire life of the proposed contract. This was one of the terms negotiated which necessitated the new legislation and Congress was so advised. The legislative history of the 1950 act discussed above indicates to me that Congress was willing to accept the decision and the word of the Postmaster General that mail service in New York City would be seriously impaired if the current contract were allowed to expire on December 31, 1950, without legislation being previously passed to enable the Postmaster General to execute the new contract which had been negotiated to supply continuous service in New York City. I think that in the opinion of the Postmaster General and in the opinion of Congress, a true exigency existed which required that the new contract be executed without delay. Despite the fact that subsequent events may persuade the majority that a delay would not necessarily have been fatal, I believe that the plaintiff has brought his case within the exception provided in R.S. § 3709(2). Accordingly, I would hold that the contract, executed on December 29, 1950, without prior advertisement, is a valid contract binding on the Government.

Finally, I note that the majority states that if the contract in suit had been drawn in conformance with the April 1950 advertisement, a second advertisement would not have been necessary. I can only suggest that if the contract had been in accordance with the April advertisement, there would have been no necessity for the enactment of the December 27, 1950 statute, since the terms of the April advertisement were all within the scope of existing law.

The majority has held that plaintiff is entitled to recover on certain but not on all of its claims. I agree that plaintiff should recover on the claims allowed by the majority, but because I am of the

opinion that the contract was an authorized and valid one, I would allow the plaintiff to recover under the usual rules applicable to damages for breach of contract. With respect to certain of its claims, I am of the opinion that plaintiff has not established its right to recover. Because my reasons for thinking plaintiff is entitled to recover on some of its claims are different from those expressed by the majority, I shall discuss each of the claims presented.

(a) *Unreimbursed costs of power conversion equipment.*

Paragraph 2(a) under *Variable Costs* in the contract provided as follows:

"The contractor in reliance upon this contract and the term of the contract is committing itself to expend a sum now estimated at $350,-000 to acquire and install equipment to convert alternating current to direct current [sic] for the operation of the tube system. It is understood and agreed that Schedule A shall contain an item which shall represent the annual payment required for even amortization over the 10-year term of this contract of such cost when finally determined *with interest at 3%* per annum. *. * * *"
[Italics supplied.]

The contract then provided, under the section headed Variable Costs, for reimbursing plaintiff for its costs of acquiring and installing the conversion equipment in the event of termination of the contract by plaintiff under various circumstances.

During 1951 and 1952 plaintiff spent $214,870.13 to acquire and install conversion equipment, and reported such charges to the Post Office Department, as required by the contract. Following an audit by the Post Office Department of plaintiff's books and records for the years 1951 and 1952, the Department accepted the charge as the cost of conversion for the purpose of calculating the monthly payments to be made to plaintiff under the contract in reimbursement of such cost. During the years 1951, 1952 and 1953, the Post Office Department reimbursed plaintiff on account of such conversion expenditure in the sum of $73,305.66 as principal and $10,995.84 as interest at 3% on the unpaid balance. Such reimbursement payments were included in the monthly payments made by defendant to plaintiff under the contract. No further payments in connection with this item have been made by defendant to plaintiff. Accordingly, there is due and owing plaintiff from defendant the principal amount of $141,-564.47 ($214,870.13—$73,305.66), *plus interest* on such unpaid principal at the rate of 3% per annum from December 1, 1953, to date of settlement. Defendant's arguments against plaintiff's right to recover on this item, completely ignore the clear provisions of the contract under which the Post Office Department obligated itself to reimburse plaintiff for this expenditure.

(b) *Cost of set of new carriers.*

The contract provided in paragraph 2 (a) under the section *Variable Costs,* in pertinent part as follows:

" * * * It is further understood and agreed that the contractor in preparation for adequate service under this contract from time to time will contract or arrange for the purchase of sets of new carriers and that such contracting or arrangement must be made at a considerable length of time before the carriers can be delivered and put into use."

The contract further provided under the same section for reimbursement to plaintiff of its costs relative to new sets of carriers in the event of the termination of the contract under various circumstances.

During 1953 plaintiff contracted and arranged for the purchase of a new set of carriers for use in the system in the fall of 1954. The order for the manufacture of the new carriers was placed with the Lamson Corporation, an affiliate of plaintiff. It had been the custom of plaintiff for a period of years to have the carrier shells manufactured by the Lamson Corporation.

Immediately after defendant notified plaintiff, on December 7, 1953, that the pneumatic tube system would continue to be shut down until further notice, plaintiff suspended work on the new carriers. Plaintiff cancelled its contract with the Lamson Corporation as to any uncompleted portion following plaintiff's letter of January 23, 1954 declaring the contract terminated for defendant's breach.

The termination charges of Lamson Corporation to the plaintiff included no item for profit. The total adjusted cost to plaintiff on such cancellation and termination of its contracts and arrangements for the purchase of the new carriers was in the amount of $30,290.56. Included in the termination charges of Lamson Corporation to plaintiff was the sum of $2,739.04 representing inventory of the Lamson Corporation in existence prior to its receipt of plaintiff's purchase order in June 1953. Although the record establishes that of this amount $1,233.86 would have been expended in the production of the contract for the set of new carriers, if that contract had been completed, it is not shown that the inventory represented by that amount was purchased for this contract or could not have been used on other work of the manufacturer. I am of the opinion that plaintiff's claim of $30,290.56 is excessive by the amount of $2,739.04. Plaintiff should recover $27,551.52 which is reasonable and no part of which has been paid by defendant.

(c) *Payment for December 1953 expenses.*

The contract obligated the Post Office Department to pay the plaintiff monthly amounts calculated in accordance with the terms of the contract. The amount which became due to plaintiff for the month of December 1953, excluding any amount representing reimbursement of principal cost of conversion equipment or interest thereon, disposed of hereinbefore, was the sum of $27,960.94. Plaintiff should recover this amount, no part of which has been paid by defendant to plaintiff.

(d) *Expenses of January 1954.*

Following receipt, on December 30, 1953, of the letter from the Postmaster General of December 29, 1953 (finding 26), plaintiff maintained itself in a position of readiness to resume service if the defendant desired service resumed (findings 27, 28, and 41). Pursuant to its letter to defendant of January 7, 1954, in which plaintiff advised defendant that unless defendant rescinded its action of December 29, 1953, by January 22, 1954, plaintiff would declare the contract terminated for breach by defendant, plaintiff on January 23 1954, did so notify defendant of its termination of the contract for defendant's breach and proceeded to release its employees as rapidly as possible thereafter. Wages and salaries paid by plaintiff to its employees for services in January 1954, and other normal expenses incurred in January 1954, amounted to $8,241.69. Such expenses were reimbursable to plaintiff under the terms of the contract. Included in this item is $2,000 representing that part of the 1953–1954 special franchise tax owed by plaintiff and allocable to January 1954. The matter of plaintiff's special franchise taxes is considered in finding 47 which covers plaintiff's taxes for the second half of the 1953–1954 tax year, including the $2,000 allocated to January 1954. Accordingly I would eliminate the $2,000 item from plaintiff's reimbursable expenses for January 1954 and consider it in connection with the issue of plaintiff's right to recover the second installment of its 1953–1954 special franchise taxes. Plaintiff should recover $6,241.69 as expenses incurred under the contract during January 1954.

Defendant contends that plaintiff could have mitigated defendant's damages by releasing its employees on December 30, 1953, when it received the Postmaster General's letter stating that the contract was being cancelled for invalidity or pursuant to Postal Regulation 97.67. In view of the abruptness of defendant's action and the questionableness of defendant's legal position, I think plaintiff acted prudently and properly in asking de-

fendant to reconsider and rescind its action and in holding its organization in readiness to continue performance for a reasonable time. The 23 days during which plaintiff kept its organization in a position to resume operations does not seem to be unreasonable, nor does such action amount to a failure by plaintiff to mitigate damages under the circumstances of this case.

(e) *Anticipated net profits of plaintiff for 1954–1960*:

Plaintiff claims the right to recover anticipated net profits. Where such profits can be proved with reasonable certainty, are not legally remote, and can fairly be said to be within the contemplation of the parties, they are recoverable as damages in a suit for breach of contract. United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168; Chain Belt Co. v. United States, 115 F.Supp. 701, 127 Ct.Cl. 38. In the instant case plaintiff has established the cost of performance of the contract with sufficient certainty to enable the court to determine the profits which plaintiff might reasonably have anticipated.

Under that part of the contract of December 29, 1950, entitled *Variable Costs,* it is stated in part:

"* * * It is, accordingly, agreed that the compensation to be paid the contractor for its services hereunder, and as rental for the leased property shall be for the calendar year 1951, the sum of $352,912.08 and shall be for each succeeding year the sum of $163,972.31, and in addition to said sum in each succeeding year the amount of the contractor's costs for the preceding calendar year of those items listed on Schedule A, annexed hereto and made a part hereof, but in no event shall the total compensation payable for any calendar year exceed the sum of $387,628.65. * * *"

The Schedule A referred to above included various taxes and operating expenses, salaries, pensions, maintenance and repair, patterns, jigs, fixtures and amortization of the cost of power conversion equipment. The sum of $352,912.08 quoted above included an estimated amount to cover the 1951 Schedule A costs. In 1952 the sum of $350,691.69 paid to plaintiff included the exact amount of its Schedule A 1951 costs and the $163,972.31. In 1953 plaintiff received payment in the sum of $324,149.95 at a rate which would reimburse it for its 1952 costs with the qualifications stated in finding 46. Nothing was paid to represent the 12th month of 1953 during which time contract operations were suspended by defendant's notice to plaintiff. Plaintiff's claim for that month has been discussed hereinbefore.

The ceiling amount set in the contract is the product of the number of miles of the tube system, i. e., 25.0083 times $15,500, the ceiling rate of expenditure for the transmission of mail established by act of December 27, 1950.

Out of the sum of $163,972.31 provided in the contract as the fixed sum plaintiff was to receive for each year (plus variable costs) the plaintiff was to meet its other expenses of carrying on its business and realize its profits. Plaintiff's theory for computing its net profits is to deduct from $163,972.31 its constant costs each year, actual or estimated, which are not costs such as included in Schedule A to the contract. Plaintiff's claim for the years 1954 through 1960 is as follows:

For 1954 ................$136,301.59
For each of the years
 1955–60 ................ 139,241.59
For the aggregate of these
 7 years ................ 971,751.13

The constant costs which plaintiff would deduct as illustrated above are not defined or referred to in the contract. As used by plaintiff they include, among other things, such general expenses as life and health insurance, supplies, travel, professional services, directors' fees, postage, and, as operating expenses, clerical and stenographic salaries, rent, depreciation of machinery, telephone, and supplies. Plaintiff's claimed actual con-

stant costs for 1949 were $19,972.31. In 1950 they were $25,050.67; 1951, $23,396.83; 1952, $27,984.01; 1953, $27,626.10. The estimate of such costs for 1954 is $27,670.72 and for 1955 and subsequent years to 1960, inclusive, $24,730.72 for each such year.

The plaintiff prepared estimates of its variable costs for the years 1954 to 1959 for classifications of expense similar to those tabulated in Schedule A of its contract. Such costs would have been recovered had the contract run its full course through 1960. It is reasonable to conclude that plaintiff's constant costs, which were chargeable against its constant allowance under the contract for the determination of its contract income, would follow substantially the same ratios of variations as its variable costs.

A fair and reasonable determination of plaintiff's anticipated contract profits for the calendar years 1954 through 1960 is $952,008.88. The following tabulation reflects the basis for this determination:

| Years | Variable costs exclusive of amortization charges | | Constant costs and contract allowances | | Income from contract operations |
|---|---|---|---|---|---|
| | | | Costs | Allowances | |
| (a) Actual results of operations: | | | | | |
| 1951 | $159,247.16 | | $23,396.83 | $163,972.31 | $140,575.48 |
| 1952 | 171,559.30 | | 27,984.01 | 163,972.31 | 135,988.30 |
| 1953 | 183,844.47 | | 27,626.10 | 163,972.31 | 136,346.21 |
| Totals | 514,650.93 | | 79,006.94 | 491,916.93 | 412,909.99 |
| Average | 171,550.31 | 100% | 26,335.65 | 163,972.31 | 137,636.66 |
| (b) Projected operations for succeeding years based upon estimates as follows:(*) | | | | | |
| 1953 | 183,844.47 | 107.17% | 28,223.92 | 163,972.31 | 135,748.39 |
| 1954 | 176,818.60 | 103.07% | 27,144.15 | 163,972.31 | 136,828.16 |
| 1955 | 173,747.10 | 101.28% | 26,672.75 | 163,972.31 | 137,299.56 |
| 1956 | 178,847.10 | 104.25% | 27,454.55 | 163,972.31 | 136,517.76 |
| 1957 | 182,866.10 | 106.60% | 28,073.80 | 163,972.31 | 135,898.51 |
| 1958 | 186,755.10 | 108.86% | 28,668.99 | 163,972.31 | 135,303.32 |
| 1959 | 192,554.10 | 112.24% | 29,559.13 | 163,972.31 | 134,413.18 |
| Totals | 1,275,432.57 | | 195,797.29 | 1,147,806.17 | 952,008.88 |

(*) The recoverable variable costs for 1954 are represented by the actual variable costs for 1953, other amounts are estimates which would be recoverable the succeeding year, none of which would exceed the maximum permissible under the contract.

Defendant concedes that if the contract in suit was valid and not terminated according to law, the plaintiff is entitled to recover its anticipated profits. Defendant contends, however, that plaintiff's claim for anticipated profits is grossly inflated in that it failed to take into account plaintiff's annual interest expense in connection with plaintiff's indebtedness incurred prior to the execution of this contract and representing loans to plaintiff by its parent company to finance extension of plaintiff's tube lines to various post offices in New York City. It is defendant's position that the interest in the approximate amount of $642,000 for seven years which plaintiff had to pay on its indebtedness during the contract term following cancellation should be included in computing plaintiff's damages or income under the cancelled contract.

I am of the opinion that defendant's contention is not sound. The payment by a contractor of interest on preexisting indebtedness for capital invested in the business is not a cost of performing the contract and is not an element to be considered in computing the contractor's profit or loss resulting from the performance of the contract. That plaintiff might have had to use its profits earned

through performance of the contract in reducing the preexisting debt does not change the character of such profits insofar as that contract is concerned. The fact that the contract in suit constituted plaintiff's only business and therefore the only source from which plaintiff could derive the money to pay the interest on invested capital, does not make such interest a cost of performing the contract.

If, following the classic rule of damages, the court is to render a judgment which will place plaintiff in as good a position as it would have been had it been permitted to complete performance of this contract, that judgment should represent the excess of the contract price over the *expense* which plaintiff was spared by virtue of the fact that it did not have to complete performance under the contract for that period. Miller v. Robertson, 266 U.S. 243, 257, 45 S.Ct. 73, 69 L.Ed. 265.

The expense represented by the annual interest payments which plaintiff had to make on the $2,000,000 invested by the parent corporation in plaintiff's business was a fixed expense to the plaintiff which continued notwithstanding the contract in suit. While the 1951 contract price negotiated by the parties on the basis of plaintiff's 1949 operating experience (under the contract then in existence) was set in an amount which would cover plaintiff's interest on, and amortization of, the capital loan which it had made to install the tube system, as well as to cover plaintiff's uncompensated operating expenses under the contract, defendant's cancellation of the contract while it still had seven years to run obviously did not relieve plaintiff of its obligation to pay the interest on the capital loan. The servicing of this loan by plaintiff as to interest or amortization, or both, was a corporate liability of plaintiff and cannot properly be regarded or treated as an expense of performing its contract with the United States, and such interest was not reduced in any way by the cancellation of the contract. The record shows that the money which plaintiff would have received under its contract with defendant would have been sufficient to reimburse plaintiff for its actual operating costs of performance and also to enable plaintiff adequately to service the loan to the parent company. While the cancellation of the contract did relieve plaintiff of the operating expenses of the contract it is clear from every standpoint that it did not relieve plaintiff of the expense of servicing the loan.

From the above it seems clear that the expense to plaintiff of servicing the loan from its parent corporation was not an operating expense in connection with the performance of the contract with defendant and should not, therefore, be taken into consideration in estimating plaintiff's damages suffered by reason of defendant's wrongful cancellation of the contract prior to completion.

I am of the opinion that plaintiff is entitled to recover $952,008.88 representing anticipated profits under the contract for the years 1954 through 1960.

(f) *Excess of 1953 over 1952 variable costs.*

If the contract in suit had continued in force throughout the calendar year 1954, plaintiff would have received in 1954 the excess of its 1953 variable expenses over its variable expenses for 1952 which amounted to approximately $12,285.16. Plaintiff claims this item as part of the damages which it is entitled to recover for defendant's breach of its contract in 1953.

In finding 42 and earlier in this dissenting opinion it was noted that plaintiff received from defendant under the contract the sum of $324,149.95 for eleven months of that year. The contract allowance for December 1953 is reported in finding 40, other than amortization charges in connection with the power conversion which was allowed in full for the unamortized portion thereof in finding 34. The payments and the amount reported for 1953 were based in part upon the variable expenses incurred by plaintiff for 1952 and represent recoupment in full for such expense.

The contract provided that, except for the first year of operations thereunder, the recoupment of variable expenses for any current year would be recovered in payments by defendant during the following year.[14] Thus, the actual expense for variables during the last year of contract operations would never be recovered. The variable expenses paid during the first year of operation under this contract, i. e., in 1951, were based upon estimated sums which included an allowance of $40,250 for the amortization of the power conversion cost. The actual amortization taken by plaintiff in its 1951 variable costs was only $18,494.60. Thereafter, the amortization was at the rate of $22,983.41 annually. The calendar year 1953 was the last year of plaintiff's operations under this contract. Under the circumstances and under the terms of the contract there is no basis for allowing plaintiff to recover as damages this item of variable costs. However, plaintiff's 1953 variable costs actually incurred in that year have been included in the estimates which I have projected over the following years for the purpose of determining plaintiff's anticipated profits for those years.

(g and h) *New York City Special franchise taxes.*

One of the items of variable costs under Schedule A of the contract is "Special Franchise Taxes—Manhattan." The second half of plaintiff's special franchise tax on its pneumatic-tube system for the tax year July 1, 1953 to June 30, 1954, was due on April 1, 1954 in the amount of $12,792.18, and had the contract continued during its term, this tax payment of $12,792.18 would have been included as a variable cost for the year 1954 to which plaintiff would have been entitled to reimbursement. Plaintiff says that it owes such tax to the City of New York, but the amount of such tax has not yet been paid by plaintiff.

The State Equalization Board of New York assessed the value for special franchise tax purposes of plaintiff's pneumatic-tube system for the tax year July 1, 1954 to June 30, 1955 in the amount of $712,000. Plaintiff duly protested the assessment of such value in a proceeding before the Supreme Court of the State of New York on May 18, 1955, requesting that the assessed valuation of its system be reduced to zero because of the worthlessness of the pneumatic-tube system resulting from the termination of its contract with the Government.

Based on the assessed valuation of $712,000, New York City has levied a special franchise tax on plaintiff for the year July 1, 1954 to June 30, 1955 in the amount of $26,700, payable one half ($13,350) on October 1, 1954, and one half on April 1, 1955. Plaintiff has not paid any part of this tax.

If it is determined by the Supreme Court of the State of New York that for the 1954–1955 tax year plaintiff's pneumatic-tube system had any value for purposes of special franchise tax, plaintiff will be obligated to pay the tax based upon whatever valuation is assessed pursuant to the decision of the New York courts. Any special franchise tax so payable by plaintiff will be one of the items of variable cost under Schedule A of the contract under the heading "Special Franchise Taxes—Manhattan." Had defendant not breached the contract and

14. The contract provides:
"Anything to the contrary hereinabove notwithstanding, no additional payment or refund shall be due after the close of the last contract year of 1960 as a result of the contractor's actual charges properly chargeable to the expense accounts set forth in Schedule A for the calendar year 1960.
"In the event this contract is terminated prior to the expiration of the term of this contract, the principles and procedures above set forth shall be followed as closely as may be in the determination of any additional payments from the Government, or refund from the contractor to the Government, arising out of the adjustment of the cost items in Schedule A applicable to the year in which the termination occurs, and such additional payment, or refund, shall be made promptly after such determination."

instead permitted the contract to remain in force during its term, any special franchise tax payments made by plaintiff on October 1, 1954 and April 1, 1955, would have been reimbursable to plaintiff under the contract and for this reason plaintiff claims that it is entitled to recover any special franchise taxes it may be required to pay for the tax year 1954–1955.

Defendant resists this claim on the ground that plaintiff has not actually paid either the second half of the taxes for 1953–1954 or the taxes assessed (and protested by plaintiff) for the tax year 1954–1955.

As to the special franchise taxes assessed for the tax year 1953–1954, such taxes were incurred while the contract was still in force and as a result of the contract. One half of such taxes have been paid by plaintiff and reimbursed by defendant under the contract. The remaining half of the 1953–1954 taxes which were due in April 1954, were not paid by plaintiff. However, since plaintiff's liability for the special franchise tax for 1953–1954 was incurred as a result of the contract which was in full force and effect at the time the tax was assessed, it would appear to represent an expense incurred in the performance of the contract and therefore a proper item of damage in this suit for damages for breach of the contract. United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168. Why plaintiff has not paid the second installment of the 1953–1954 special franchise tax does not appear from the record, but apparently plaintiff concedes its liability for such payment and the matter of this tax is not in litigation in New York. Accordingly there should be included in plaintiff's judgment herein the item of $12,792.18 representing the second half of its 1953–1954 special franchise taxes.

As to the special franchise taxes assessed for the tax year 1954–1955, such taxes, if validly incurred, were incurred after the contract, rightly or wrongly, was terminated and cannot be said to have been incurred as a result of plaintiff's contract with the United States. Accordingly, whether or not plaintiff is ultimately required to pay the tax assessed or some lesser tax, I am of the opinion that such expenditure when made will not be a proper item of its damages arising out of the breach of this contract by the Government.

(i) *Removal of equipment from Government-owned stations.*

The contract in suit provided that the contractor would at its own expense remove the tubes, power plants, receiving and dispatching apparatus, equipment and devices from Government-leased premises, at the expiration of the contract term, or, at the termination of the contract, or at the termination of the lease of such leased premises, if requested to do so by the Postmaster General (finding 49). Plaintiff was under no contractual obligation to remove its equipment from Government-owned premises.

At the time of the cancellation of the contract on December 29, 1953, defendant insisted that plaintiff remove the above equipment from both Government-leased and Government-owned premises at plaintiff's expense and warned plaintiff that if it did not do so, the Government would dispose of the equipment and credit the proceeds against the cost of removal. Plaintiff advised defendant by letter of March 17, 1954, that defendant had no right under the contract to require plaintiff to pay the cost of removal of equipment from Government-owned premises, or to dispose of plaintiff's equipment. Finally, and under protest, plaintiff advised defendant that it would remove the equipment from both Government-owned and Government-leased premises and would include the cost of the removal from Government-owned premises in its claim against defendant.

Plaintiff sought purchasers and, on March 24, 1954, entered into a contract with a salvage company for the purchase of all of plaintiff's equipment located in both Government-owned and Government-leased post office premises. The purchase price was $60,000. The con-

tract between plaintiff and the salvage company provided that plaintiff would pay to the salvage company the sum of $25,650 as the cost to the salvage company of removing plaintiff's equipment from the Government-owned premises. The commissioner has found that this was the best offer made to plaintiff and was a reasonable one and we have adopted that finding. The equipment was completely removed by August 1954.

Defendant concedes, as it must, that the contract obligated the plaintiff to pay the cost of removal of equipment only when it was removed from Government-leased premises, but defendant urges that plaintiff is not entitled to recover as damages the cost it incurred in removing equipment from Government-owned premises because the contract did not obligate the Government to pay the costs of such removal. It is true, of course, that plaintiff could have refused to remove the equipment from the Government-owned premises when it was ordered to do so by the Government and, if defendant carried out its threat to remove the equipment itself and credit the proceeds realized by it for such equipment against the cost of removal, plaintiff could have sued the Government for the salvage value of the equipment. However, it appears to me that the course plaintiff followed was a proper one in view of its obligation to mitigate the damage that would have resulted from defendant's proposed action. Chain Belt Co. v. United States, 115 F.Supp. 701, 127 Ct.Cl. 38, 57, 58. Plaintiff should recover its reasonable cost of removing the equipment from Government-owned premises, which the court has found to be $25,650.

The Government has interposed two counterclaims which the majority has disposed of by simply noting that they will be dismissed. Under the holding of the majority that the contract in suit was invalid for lack of authority, it may be that the Government's first counterclaim has some merit. However, under my view of the case, both counterclaims should be dismissed for the reasons which I shall set forth below.

*Defendant's first counterclaim.*

Defendant contends that the contract of December 29, 1950, was made "pursuant to discussions and negotiations, rather than pursuant to public advertisement as required by law with the result that the public competition in the letting of mail contracts contemplated by law was suppressed and defeated, and said purported contract was executed contrary to law, and is void and of no force and effect." Defendant claims that money paid by defendant during the period from January 1, 1950 to November 30, 1953, was therefore illegally paid under an invalid contract and was greatly in excess of the fair and reasonable value of the services rendered by plaintiff and that defendant is entitled to recover from the plaintiff the total amount paid less such sum as plaintiff might prove to be the fair and reasonable value of such services.

The commissioner has found that the year 1950 is not involved since the contract in suit does not cover that year. The commissioner has also found that the total sum paid to plaintiff by defendant for 1951, 1952 and the first 11 months of 1953 was $1,027,753.72 and represented the reasonable value of plaintiff's services during that period. Since I am of the opinion that the contract was a valid one, there is no legal basis for defendant's first counterclaim which should accordingly be dismissed.

*Defendant's second counterclaim.*

Defendant claims that plaintiff owes it $39,685 for the repair of leased post office premises and $1,295 for the repair of Government-owned post office premises.

The only provision in the contract relating to removal of property owned by plaintiff, repair of the premises or restoration of premises, provided that at the termination of the contract the contractor would remove his equipment from *leased* post office premises (see finding 49). The contract contained no provi-

sion requiring the plaintiff to restore premises which had been altered to accommodate plaintiff's tube system to its original condition, although such provision had been included in contracts prior to the one executed on July 1, 1948. Accordingly, plaintiff's only obligation under the contract regarding removal was to remove with due care its property from leased post office premises. In the absence of a contract provision covering the degree of care to be used, the law will imply an obligation on plaintiff's part to exercise ordinary care in such removal. Chain Belt Co. v. United States, supra. There was no contractual obligation on plaintiff to restore the premises to their *original* condition.

In order to establish its right to recover on its counterclaim for the cost of repairs, defendant had the burden of showing that the removal work done by plaintiff was not done with ordinary care. There is no evidence in the record that plaintiff failed to use ordinary care in removing its equipment from defendant's premises and accordingly defendant has not established its right to recover on this counterclaim and I am of the opinion that it should be dismissed.

In summary, the various items of plaintiff's claims for damages for breach of its contract and the amount which I would hold to be recoverable, are as follows:

| Item of claim | Amount Recoverable |
|---|---|
| (a) Unreimbursed cost of power conversion equipment | $ 141,564.47 |
| (b) Cost of new set of carriers | 27,551.52 |
| (c) Payment for December 1953 expenses | 27,960.94 |
| (d) Expenses of January, 1954 | 6,241.69 |
| (e) Anticipated net profits for 1954–1960 | 952,008.88 |
| (f) Excess of 1953 over 1952 variable costs | 0 |
| (g) New York City special franchise taxes for the second half of the 1953–1954 tax year | 12,792.18 |
| (h) New York City special franchise taxes for the tax year 1954–1955 | 0 |
| (i) Removal of equipment from Government-owned stations | 25,650.00 |
| Total | $1,193,769.68 |

MADDEN, Judge (dissenting).

I agree with what Judge LITTLETON has written in dissent, but, in order to give a somewhat different emphasis to what I regard as the crux of the case, I write this separate opinion.

I would attach little importance to the advertisement which took place in the spring of 1950, except as an historical fact confirming what was already obvious, i. e., that the plaintiff was the only possible potential contractor for a pneumatic tube mail contract in New York. I would pass, then, to the Act of December 27, 1950, under which the contract in suit must stand or fall.

The statute was a general statute, to be applicable anywhere, at any time in the future, for the transmission of mail by pneumatic tubes or other mechanical devices. Except in its section 3, which was particularly pointed to the New York situation, it had no more applicability to the New York situation in 1950 than to a potential situation in Chicago or Los Angeles in 1960.

Section 2 of the Act calls for advertising for bids and provides that no contract shall be let except to the lowest responsible bidder. In the instant case there was no advertising, if we disregard what had taken place months be-

fore; there was no bidder; and the contract was arrived at by negotiation. If the 1950 statute required advertising, the requirement was not satisfied, and the contract was invalid.

I think the 1950 statute did not require advertising, in the circumstances. The general statute relating to advertising in the letting of Government contracts is R.S. § 3709, as amended, 41 U.S.C. (1946 ed.) 5, 41 U.S.C.A. § 5. It says:

"Unless otherwise provided in the appropriation concerned or other law, purchases and contracts for supplies or services for the Government may be made or entered into only after advertising a sufficient time previously for proposals, except (1) when the amount involved in any one case does not exceed $100, (2) when the public exigencies require the immediate delivery of the articles or performance of the service, (3) when only one source of supply is available and the Government purchasing or contracting officer shall so certify, or (4) * * *."

It would be impossible to imagine a situation in which exception (3) of this statute would be more clearly complied with, than the mail tube situation in New York in 1950. The postal officials and the managers of the 1950 legislation in Congress knew to a certainty and so stated in the committee reports, that if pneumatic tube service was to continue in New York, it would be continued by the plaintiff.

In the face of this knowledge, and the further knowledge that the existing contract with the plaintiff would expire four days later, and that therefore the enactment of the legislation was urgent, the court holds that Congress, on December 27, 1950, required the Postmaster General to go through the futile motions and subject the Government to the delay and confusion and expense of advertising for bids.

I think the general statute, section 5, quoted above, relating to advertising in the letting of Government contracts is as applicable to contracts for carrying the mail as it is to other Government contracts, and was as applicable to carrying the mail by means of pneumatic tubes in New York in 1950, as it was to other contracts for carrying mail anywhere, by any method. I find no suggestion anywhere that the reasonable exceptions to the general advertising requirement contained in section 5 would be less reasonable if used by the Post Office Department than they would be if used by the Department of the Interior.

As to the requirement of R.S. § 3709 that, in order to contract without advertising because only one source of supply is available, "the contracting officer shall so certify," I think that requirement was satisfied because the Postmaster General himself signed the contract. If the contracting officer had been a lesser official, he would have had to certify to the Postmaster General, the chief of his department, the reason for the failure to advertise. The Postmaster General's certification to himself would have been another useless gesture, comparable to the formality of advertising for non-existent bidders.

It is apparent from what I have written that I think the plaintiff's contract was valid and was breached. I would visit upon the United States the normal consequences of breach of contract.

JONES, Chief Judge, took no part in the consideration and decision of this case.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:

1. Plaintiff, New York Mail and Newspaper Transportation Company, is a corporation chartered by the State of New York and is a subsidiary of Lamson Corporation of Delaware.

2. From 1932 to 1954 plaintiff was the owner of an integrated system for the transportation of the United States

mails in New York City. This was its sole business undertaking. The system consisted of dispatching and receiving stations located in 22 post offices (11 leased and 11 Government-owned), in New York City, and underground pneumatic tubes which connected the several post offices. This system was first established about 1897 and has been added to, from time to time, since then. Except for a short interval in 1901 and 1902 and for a four-year interval in 1918–1922, the system has, since its original establishment, been used continuously for the transportation of the United States mails, pursuant to a series of contracts covering varying periods of time between the owners of the system and the United States. The system was not in operation during the periods mentioned because of adverse reports upon it by the Postmaster General and failure of Congress to appropriate funds for its use. Since 1932 all contracts pertaining to the use of the system have been between the plaintiff, as owner of the system, and the defendant. Each of these latter contracts was executed on behalf of the defendant by its then Postmaster General or Acting Postmaster General or an Assistant Postmaster General.

Since 1938 there had been discussions and negotiations between plaintiff and the Post Office Department concerning new contracts. Plaintiff had been the only bidder since 1932 and was the only company in New York which had the facilities which would have enabled it to make a bid.

3. The contracts which plaintiff and defendant had prior to 1938 provided that plaintiff would pay all expenses, including the wages and salaries of employees and the cost of electric power for the operation of the pneumatic tube system, while defendant paid for the service rendered at agreed rates per mile of tube. In 1937 and early 1938 plaintiff sought a change in this arrangement, desiring, among other things, that defendant lease the system. The Postmaster General rejected plaintiff's bids

as unacceptable in form, not responsive to the advertisement, nor in accordance with the applicable appropriation. A temporary contract was negotiated for the term March 1, 1938, to June 30, 1938, under which defendant leased the system and paid all operating costs exclusive of maintenance and station change expenses. It was also provided that the Postmaster General might annul, cancel or terminate the contract whenever in his opinion public interest required it. This provision was continued in contracts between the parties until June 30, 1948. Defendant's advertisement inviting proposals for the period subsequent to July 1, 1938, was in the alternative. It invited proposals on (1) route 507011, contemplating the furnishing of service to defendant on the basis previously used, and (2) route 507011–A on a lease or rental basis. Under the contract beginning July 1, 1938, and succeeding contracts until December 31, 1950, the defendant operated plaintiff's tube system with its own employees and assumed the electric power costs with plaintiff bearing the expenses of repair, maintenance, plants and carriers. The series of contracts covering the periods including the new arrangement on which plaintiff was sole bidder, were as follows:

July 1, 1938, to June 30, 1940.

July 1, 1940, to June 30, 1941, extended to June 30, 1942.

July 1, 1942, to June 30, 1947, extended for two 6-months' periods to June 30, 1948.

July 1, 1948, to June 30, 1949, extended to Dec. 31, 1949.

Jan. 1, 1950, to Dec. 31, 1950.

None of the foregoing contracts between plaintiff and defendant had exactly the same terms and conditions as in the applicable invitation for bids.

4. The law relating to contracts for the transmission of mail in effect on April 24, 1950, when defendant advertised for proposals for furnishing a pneumatic tube system on a lease or rental basis, was in part as follows [Title 39

U.S.C. § 423 (1946 Ed.Supp. III)], 39 U.S.C.A. § 423:

"*Transmission by pneumatic tubes; contracts; expert commission; report.* The Postmaster General may enter into contracts not exceeding in the aggregate $1,388,-759 for the transmission of mail by pneumatic tubes or other similar devices for a period not exceeding ten years, after public advertisement once a week for a period of six consecutive weeks in not less than five newspapers, one of which shall be published in each city where the service is to be performed. Contracts for this service shall be subject to the provisions of the postal laws and regulations relating to the letting of mail contracts, except as herein otherwise provided, and no advertisement shall issue until after a careful investigation shall have been made as to the needs and practicability of such service and until a favorable report, in writing, shall have been submitted to the Postmaster General by a commission of not less than three expert postal officials, to be named by him; nor shall such advertisement issue until in the judgment of the Postmaster General the needs of the Postal Service are such as to justify the expenditure involved. Advertisements shall state in general terms only the requirements of the service and in form best calculated to invite competitive bidding."

The Postmaster General was given the right to reject any and all bids, and no contracts could be awarded except to the lowest responsible bidder tendering full and sufficient guaranties.

5. Pursuant to the statute quoted above, the Postmaster General, by order 42425, dated January 25, 1950, appointed a committee of three expert postal officials for the purpose of investigating the need and practicability of continuing beyond December 31, 1950, the use of pneumatic tubes for handling mail in New York and Brooklyn under a new contract.

6. On March 10, 1950, the committee submitted a report to the Postmaster General. The report discussed the service being rendered, made comparisons of the speed and cost of transmission by pneumatic tubes with surface transportation in motor vehicles and came to nine conclusions, which in summary were that the pneumatic tube service was a valuable auxiliary transportation medium supplementing the motor vehicle service and should be continued. It was recommended that the service between Brooklyn and New York City should be discontinued when the lines were removed from Brooklyn Bridge in connection with repairs then under way, but that an advertisement should be issued for pneumatic tube service in New York City for a lease of five or ten years from January 1, 1951, stipulating that the bidder should make any required conversion of equipment from direct to alternating current.

7. At the same time the committee on tube service was making its investigation, a group of Post Office inspectors was making an independent survey of the motor vehicle service of the department in New York City. It had always been necessary to maintain vehicle service roughly paralleling the route of the pneumatic tube system in order to transport mail which was too bulky for tube transmission or which had to be transported during hours each day when the tubes were not in operation. In 1917 motor vehicles were substituted for the horse and wagon for the purposes described. In 1950 the condition of the mail trucks, and truck service generally, was in bad condition and inefficient. Some of the trucks were 1917 models. It had been necessary to supplement the department's vehicles with hired trucks. As a result of the survey, several hundred new trucks were added to the motor fleet and the number of motor vehicle circuits was increased from 26 to 40. The old motor equipment was sold as junk.

8. After approval was given in April 1950 for the increase in truck circuits, the Assistant Postmaster General, on April 21, 1950, directed that further study be given to the desirability of continuing the pneumatic tube system in light of the committee's statement in its March 10 report that new motor vehicle circuits might be able to absorb a large percentage of the mail being transported by the tubes. Plans for such circuits were in formative stages in March and had not been presented for departmental consideration.

In April 1950 the truck circuits were not only increased but a departmental directive was issued ordering reduction in the number of mail and parcel post deliveries, discontinuance of night mail collections from street letter and chute boxes and the closing of service windows of the post offices each day at 6:00 p. m.

9. In light of the two developments described in the finding above, the committee submitted a supplemental report on May 15, 1950. This report stated that the revised and reduced postal service would decrease the utility of the tube operation, and the new truck circuits, if supplemented by 15 more trucks, would provide the service which in the March report was estimated as equivalent to the tube service. The supplemental report estimated that the total annual cost of operating the additional trucks would be $510,336.19 as compared with an annual cost of $790,970.82 to maintain the pneumatic tube service, or an annual saving of $280,634.63. In light of these conclusions the report recommended that pneumatic tube service be discontinued "if in conformity with present policy."

10. A second supplemental report was made on June 6, 1950, by the tube committee. This report showed that the Post Office Department regularly employed 138 persons to operate the tube system. By various tests the committee concluded that 77 mail handlers could take care of the mail being carried by the tubes for a net saving of 61 employees. Taking into account this saving in personnel, the committee revised its cost analysis of the competing systems and showed that as against an annual cost of $790,970.82 for the operation of the tube system, the additional motor vehicle service to supplant the tubes would cost only $341,568.59, effecting thereby an estimated net annual saving of $449,402.23 instead of the $280,634.63 shown by its May 15 report. The committee renewed its recommendation that the pneumatic tube service be discontinued, pointing out that these findings gave further emphasis to its May 15 recommendations.

11. In the meantime, in the light of the recommendation contained in the March 10, 1950, committee report, the Post Office Department had published on April 24, 1950, an "Advertisement Inviting Proposals for Furnishing a Tube System on a Lease or Rental Basis for Use in the Transmission of Mails by Pneumatic Tubes or other Similar Devices at New York, New York." The Acting Assistant Postmaster General sent a memorandum to the Postmaster General on May 18, 1950, attaching the reports of the tube committee dated March 10 and May 15, 1950. This memorandum reviewed the situation and concluded that changed conditions since the initial report of March 10 now made discontinuance of the tube system desirable in the interests of economical administration. A second memorandum from the Assistant Postmaster General was sent to the Postmaster General on June 7, 1950, setting forth the conclusion reached by the tube committee as described in finding 10. This memorandum raised to $452,909.37 the estimated savings per annum if the tube system would be discontinued when the current contract expired on December 31, 1950.

12. The advertisement of April 24, 1950, above referred to, invited proposals until May 31, 1950, "for furnishing a pneumatic tube system on Route 507011-A, on a lease or rental basis, for use in the transmission of the mails in the Borough of Manhattan in the City of New York, New York, for a period of five years or ten years, beginning Janu-

ary 1, 1951, in accordance with the conditions specified in the instructions to bidders."

Among other things, the instructions to bidders described the mail handling points to be embraced on the tube system and specified what the Post Office Department and the contractor would furnish. It was stated that the contractor would be required to remove the system at his own expense at the expiration of the term or the termination of the contract, if requested to do so by the Postmaster General. Further, that upon discontinuance of the service at any point the contractor would have to restore the premises to the condition in which they were received, ordinary wear and tear excepted, if requested to do so by the Postmaster General.

Paragraph 4 of the advertisement provided that the designated points on the route were to be connected by the shortest practicable route with double lines of pneumatic tubes not less than 8 inches in diameter at the expense of the contractor, notwithstanding the designation and/or location of the stations might be changed during the contract term. Paragraph 6(d) provided that the contractor should make repairs to the premises connected with the tube system resulting from damage occasioned by the installation of the tubes, power plants, receiving and dispatching apparatus, machinery, equipment and devices.

The cancellation provisions appearing in the instructions to bidders were as follows:

"8. The Postmaster General may annul, cancel, terminate and end, any contract that may be entered into under this advertisement—

"(a) For repeated failure of the tube system to operate due to matters within the control of the contractor.

"(b) For repeated failure on the part of the contractor to make necessary repairs to the tube system promptly.

"(c) For failure to have the tube system in a condition for efficient operation on January 1, 1951.

"(d) For violation of the postal laws.

"(e) For refusal to discharge any persons connected with the maintenance and repair of the tube system when requested to do so by the Postmaster General.

"(f) For failure of contractor to change the location of the tube lines, and receiving and dispatching apparatus made necessary by reason of the remodeling or rebuilding of the quarters in which the tube terminals are located; or by reason of the failure of the contractor to have all points embraced on the route as outlined in paragraph 4 of this advertisement, connected with the tube system, as more specifically provided for in said paragraph 4.

"(g) For failure of the Congress to appropriate funds for the operation of the system.

"(h) Whenever the contractor shall become a member of Congress.

"(i) Whenever, in the discretion of the Postmaster General, the public interest may require.

"If the Electric Utility Company, which is the supplier of the electricity for the tube system, changes the electricity provided from direct current to alternating current, the contract may be cancelled without further liability on the part of the Government by the Postmaster General unless the contractor at his own expense has adapted the power plants, motors, and equipment of said system for the use of alternating current prior to such change.

"The contract shall be cancelled, without additional compensation to the contractor, in the event of the purchase of the pneumatic tube system by the United States.

"Annulment, cancellation, termination or ending for any of the causes recited above shall not impair

the right of the Postmaster General to claim damages from the contractor or his surety, and such damages may, for the purpose of set-off or counter-claim in the settlement of any claim of said contractor or its surety against the United States, whether arising under this contract or otherwise, be assessed and liquidated by the General Accounting Office of the United States."

13. The plaintiff submitted to the Post Office Department, on May 26, 1950, a form of proposed contract by way of bid, the terms and condtions of which varied in many ways from the advertisement to which it was a response. Plaintiff's covering letter which accompanied the bid bond and proposed contract stated in part:

"As per our custom in the past and as per our telephone notification to you, our proposal is submitted in the form of a contract using as its base the existing contract between the parties with deletions, additions and modifications to meet the new proposed ten year contractual relationship which has been discussed between us. Conditions and requirements in your advertisement not specifically included in our proposal are intended to be excluded from our proposal."

14. The lengthy and detailed proposed rental contract submitted by plaintiff on May 26, 1950, offered to provide a tube system of double lines connecting the 22 postal points described in defendant's advertisement. The proposal provided that the contractor would maintain the pneumatic tubes and equipment and appurtenant machinery, including power plants, and that, except as otherwise provided the labor and power necessary for operation of the tubes and the handling of mails thereby should be furnished by defendant. The contractor was not to be under any obligation to change the location, arrangement, or character of its equipment, including power plants, as the same might exist at the commencement of the lease. It was proposed that the contractor would at his own expense remove the tubes, power plants, and all apparatus from leased Post Office premises at the expiration of the term or at the termination of the contract or at the termination of the lease where no relocation of a station was involved, if requested to do so by the Postmaster General. No express provision relating to repair occasioned by installation or removal of tubes and machinery was included.

15. The proposal of May 26, 1950, contained provisions permitting the Postmaster General to annul, cancel or terminate the contract for repeated failure of the tube system to operate, failure of the contractor to make necessary repairs promptly, failure to have it in condition for efficient operation by January 1, 1951, or a reasonable time thereafter, including failure to install equipment when required to convert AC current to DC current, and refusal of the contractor to to discharge any person working in connection with the operation of the tube system when requested to do so by the Postmaster General, as well as the standard prohibition clause against a Member of Congress having a contract with the United States. The contract could also be cancelled if the defendant bought the tube system. By reference to the cancellation provisions contained in defendant's advertisement and instructions to bidders set forth in finding 12, it will be seen that plaintiff's proposal of May 26, 1950, omitted the following described provisions set forth in that finding: (d), (f), (g), and (i). With reference to a provision in the advertisement which would have placed upon the contractor the expense of conversion of all equipment from DC to AC, plaintiff's proposal did contemplate the purchase and installation of conversion equipment by plaintiff but contained a clause which required defendant to reimburse it over a 10-year period for the full cost thereof plus three percent interest. Defendant's advertisement also contained a penalty provision which the Postmaster General could invoke against the contractor for

unsatisfactory service for causes within the contractor's control. Plaintiff's proposal omitted such a provision.

Plaintiff's proposal also omitted the term of the advertisement by which the General Accounting Office was to be authorized to assess and liquidate defendant's damage claims in the event of claims by the bidder arising from a termination of the contract pursuant to its terms.

16. Defendant's advertisement provided that proposals submitted thereunder should specify the rate per annum for the rental of the tube system. Plaintiff's proposal, in response thereto, provided for a computation of the rental to be paid annually for the leased property to permit the plaintiff to realize substantially the sum of $144,000 a year, covering allowance for depreciation, interest and return on investment, in addition to the contractor's costs properly chargeable against the leased property. No fixed rate per mile for rental was specified. The costs of maintaining the tube system were set out in two schedules entitled *Constant Costs* and *Variable Costs*. Each year's rental was to consist of the $144,-000 plus a fixed amount to cover constant costs plus the actual amount of the preceding year's variable costs. Accordingly, the rental was to vary annually as the preceding year's variable costs increased or decreased.

17. One paragraph of plaintiff's proposal in response to defendant's advertisement provided in part as follows:

"*Seventh:* It is agreed that it is the intent of the parties hereto that this contract shall not be deemed to be subject to the several acts of Congress relating to Post Offices and Post Roads now existing or hereafter made, or to rules or regulations of the Post Office Department now existing or hereafter made, except as such acts, rules or regulations are specifically applicable to the leasing of the property hereunder by the contractor or to the service to be performed by the contractor hereunder. It is further specifically agreed that this contract is not and shall not be subject to extension or renewal under any act of Congress now existing or hereafter made, or any rule or regulation of the Post Office Department or any other agency of the Government now existing or hereafter made, and that the term of this contract shall expire in any event at midnight December 31, 1960. It is further specifically agreed that this contract is not and shall not be subject to renegotiation or any other adjustment of the terms or amount or method of calculation of payments under any act of Congress now existing or hereafter made or any rule or regulation of the Post Office Department or any other agency of the Government now existing or hereafter made."

18. The Assistant Postmaster General wrote to plaintiff's president on November 21, 1950, stating in part:

" * * * inasmuch as the proposal you originally submitted is more or less on the basis of a 'cost-plus' contract and this would require additional legislation, * * * prepare for our perusal a tentative contract to include an 'escalator' or 'Adjustment' clause, and submit it to us."

19. Pursuant to the foregoing suggestion, plaintiff, on December 7, 1950, submitted an amended proposal, also in contract form. Substantially, it was the same as the proposal of May 26, 1950, except that a new section entitled *Variable Costs* was attached and paragraph 3 of the May proposal was changed to provide that the defendant should pay plaintiff an annual calendar year rental for the leased property in the sum of $352,912.08 or such other sum as due under the variable costs section of the amended proposal. The sum of $352,-912.08 was the amount of $14,111.80 per mile of double lines of tubes for the 25.-0083 miles of such tubes in plaintiff's system.

20. Representatives of plaintiff and defendant had a conference late in De-

cember 1950 in an attempt to reach an agreement on the terms of a contract. Among other things discussed was the matter of whether or not a new contract should include a provision giving the Postmaster General the right to cancel it in the public interest at his discretion. The advertisement and instructions to bidders had contained such a proviso. Plaintiff had left it out of its proposals. Some of plaintiff's recent prior contracts had included it and others had not. Plaintiff felt that such a provision in a contract made it unilateral in the sense that the contractor would be bound for a fixed term and the Government would not be bound. Also, plaintiff was concerned by the fact that, under its proposals, expenses for conversion to permit the use of alternating current required the outlay of considerable sums of money to be paid to it by defendant over a period of years and plaintiff wanted to remove uncertainty about the repayment.

21. In 1950 the Consolidated Edison Company of New York, Inc., which had supplied direct current for operation of the tube system, notified the Post Office Department it would discontinue the supply on December 31, 1950, unless it received assurance before that time that arrangements would be made to convert the tube system to the use of alternating current. Such conversion costs were estimated to be from $125,000 to $350,-000. Plaintiff insisted that for it to bear this expense it would have to receive a rental in excess of the statutory limit of $12,000 per mile sufficient to amortize the cost of the conversion equipment over the term of the contract. Hence, the figures set forth in finding 19 which are in excess of such statutory limit. Defendant was agreeable to a change in the statute and on December 27, 1950, Public Law 889 (81st Congress, 2nd Session) was approved, authorizing in New York a maximum annual rate of $15,500 per mile for ten years, after which the maximum was to revert to $12,000 per mile. This law repealed all previous laws in conflict with it and specified some of them. The statute re-

quired that contracts for the transmission of mail by pneumatic tubes should be subject to the provisions of laws relating to the letting of mail contracts but said nothing about postal regulations. The statute provided also that advertisements should state in general terms only the requirements of the service and be in a form best calculated to invite competitive bidding. No contract was to be let except to the lowest responsible bidder able to guarantee satisfactory performance.

Congress was aware of the fact that this plaintiff was the owner of the only tube system operating in the city of New York and that the necessity for legislation raising the authorized rate of pay per mile from the then statutory rate of $12,000 was because plaintiff could not absorb the expense of making the conversion to alternating current, pay operating and maintenance expenses and obtain a fair profit on capital outlay at the existing statutory rate of pay.

22. The plaintiff was the only bidder. After the Act of December 27, 1950 was passed, no new advertisement or invitation for bids was issued by the Post Office Department. On December 29, 1950, representatives of the plaintiff and defendant signed a document entitled, "Contract for the Rental of Pneumatic Tubes on Route 507011–A at New York, New York." This document followed closely the proposals made by plaintiff on May 26 and December 7, 1950, in answer to defendant's advertisement of April 24, 1950, and as described in prior findings. The provisions under which the Postmaster General could cancel the contract were as proposed by plaintiff except that plaintiff's proposal as set forth in finding 17 was deleted and the following substituted:

"Seventh: This contract shall be subject to all the conditions imposed by any provision of law which is by its terms applicable hereto and to the following sections of the Postal Laws and Regulations of 1948: 97.-31–97.33; 97.37–97.43, and 98.8, but the Postmaster General shall have

no right without the consent of the contractor to extend or renew this contract beyond midnight December 31, 1960.

None of the foregoing designated sections in paragraph numbered *Seventh* permits termination in the public interest.

The defendant, however, alleges that Section 97.67 of the Postal Laws and Regulations, Edition of 1948, was in force and effect on December 29, 1950. This section which was not mentioned in the document dated Decemer 29, 1950, states in part:

"(b) The Postmaster General may discontinue or curtail the service on any mail route in whole or in part in order to place on the route superior service or whenever the public interest in his judgment shall require such discontinuance or curtailment for any other cause. The contractor shall be allowed as full indemnity one month's extra pay on the amount of service dispensed with and a pro-rata compensation for the amount of service retained and continued."

23. The contract of December 29, 1950, approved as to form and legality by the Solicitor for the Post Office Department and signed by the Postmaster General, provided for payment of fixed sums of money by the defendant as an annual calendar year rental for the leased property, plus variable sums depending on whether certain variable costs of plaintiff increased or decreased, with an annual ceiling of $387,628.65. Payments were to be calculated on an annual basis and paid monthly. Further, the contractor, relying upon the document as a binding contract for ten years, committed itself to expend a sum estimated at $350,000 for conversion to alternating current, the sum to be amortized over the ten-year term of the contract and the ultimate cost thereof to be borne by defendant at three percent interest. Provisions of the contract are more fully described in subsequent findings dealing with damages.

24. On January 29, 1953, plaintiff and defendant executed a written instrument which amended the one of December 29, 1950, with relation to hours of operation of the tube system and provided that, "All other provisions of the contract of December 29, 1950, shall remain in full force and effect."

25. On May 28, 1953, a postal inspector's report was submitted to the Post Office Department containing findings with respect to the pneumatic tube operation. The report advised that in event of discontinuance of the tube system, and the use of trucks instead, the Department would save annually a minimum of $772,935.18. The Postmaster General decided to institute a pilot test by closing down the tubes and using the motor vehicle service for transportation of all mail. Plaintiff was notified on November 30, 1953, by letter, that the tube service in New York City would be closed for a period of one week effective December 1, 1953. The available capacity of the existing motor vehicle service was used with the addition of only two trucks at an added cost per day of $61.26. During the test period the mail was handled to the satisfaction of the postal officials. Plaintiff was informed by letter dated December 7, 1953, that the tube service would remain closed until further notice. Plaintiff had no notices other than those here described relative to the shutdown and was not afforded any hearing thereon.

26. On December 29, 1953, defendant sent to plaintiff a letter signed by the Postmaster General, reading as follows:

"Reference is made to the transportation of mail by the pneumatic tube system operated by you in New York City.

"This is to advise you that the Government, in the public interest and for the general welfare, considers the purported contract, dated December 29, 1950, between the Government, on the one hand, and the New York Mail and Newspaper Transportation Company, as a prin-

cipal, and Lamson Corporation of Delaware and Lamson Corporation, as sureties, on the other hand, to be null and void and of no force and effect. The purported contract if valid is hereby cancelled in the public interest. The Government will make no further use of the tube system and will not make further payments under the purported contract.

"You are also advised the Government is in need of the space occupied by the company's power plants, receiving and dispatching apparatus, equipment, and devices on leased and Government-owned premises. These must be removed from Government-owned or Government-leased premises as soon as practicable. Arrangements for necessary access to the various postal facilities for the removal of the articles mentioned should be made with the postmaster at New York."

27. On January 7, 1954, plaintiff sent defendant a letter setting forth plaintiff's position that defendant by its letter of December 29, 1953, had breached the contract of December 29, 1950. The letter advised that if plaintiff had not received notice from defendant by January 22, 1954, rescinding the Postmaster General's action, plaintiff would declare the contract terminated for breach by the defendant and would proceed to seek damages therefor. Plaintiff set forth as its reasons for delaying termination until January 22, 1954, that once plaintiff had released its employees plaintiff would not be able to provide service under the contract promptly if resumption of service was desired by the defendant, and, further, that once plaintiff's property was removed from defendant's premises it would not be able to reestablish the tube system except by the expenditure of much time and money.

28. The defendant took no action to rescind as suggested by plaintiff and on January 23, 1954, plaintiff wrote to defendant declaring the contract of December 29, 1950, terminated for breach by defendant. There is no issue in the case over whether or not plaintiff had fully performed its obligations under the contract, as amended, from December 29, 1950, to its cancellation. At the time of termination and prior thereto, plaintiff was ready, willing and able to perform its obligations under the contract. It is found, further, that the action of the Postmaster General was based on substantial evidence which is not challenged by the pleadings in this case as being fraudulent, arbitrary or capricious.

29. For the months from January 1, 1951, through November 1953, the defendant paid to plaintiff, under the contract of December 29, 1950, the sum of $1,027,753.72. The payments made for 1951 total $352,912.08, the exact amount called for by the contract. Payments for 1952 reflect changes after March of that year, at which time plaintiff made its report to the Post Office Department setting forth its charges for the preceding calendar year as provided for under the variable costs section of the contract. The payments made in 1953 reflect, for the period from July through November, a dispute between the parties concerning the allowance of a certain $7,200 item and the final payment of that item upon the dispute being resolved in favor of the plaintiff.

30. In 1938 the principal amount of plaintiff's indebtedness was nearly $3,-000,000 and at the time of the execution of the contract of December 29, 1950, was in excess of $2,000,000. No reduction has been made in the principal amount since February 20, 1950. The annual interest on the debt was $91,655.51 in 1951 and 1953 and $91,906.62 in 1952. Assuming payment of such interest annually the plaintiff would have shown a deficit in each of those three years. Plaintiff had been operating at a loss for many years prior to 1950 and its accumulated deficit in 1950 was $2,921,952.42. This deficit was $2,982,180.91 by 1953. On the date of the termination of the tube service by defendant on December 31, 1953, the undepreciated balance of plaintiff's depreciable assets was $109,-494.08 on an original investment in the

tube system of approximately $4,000,000. On April 30, 1954, this undepreciated balance was written off as worthless and the operating equipment of the tube system thereafter dismantled. Plaintiff is not now engaged in any business activities and has not been since the discontinuance of its services by defendant.

### Claims for Damages

Plaintiff is claiming damages for breach of contract by defendant as follows:

(a) The unreimbursed principal of plaintiff's expenditures for power conversion equipment, with interest at three percent per annum.

(b) The cost to plaintiff on the cancellation and termination of contracts and arrangements for the purchase of a set of new carriers for use in the pneumatic tube system in the fall of 1954.

(c) The amount which became due to plaintiff under the terms of the contract for the month of December 1953.

(d) The expenses incurred by plaintiff in January 1954 for wages, salaries and other normal expenses, all being reimbursable costs under the contract.

(e) The anticipated net profit to plaintiff under the contract for the years 1954 through 1960.

(f) The excess of plaintiff's 1953 variable costs under the contract over its 1952 variable costs under the contract.

(g) The amount of the New York City special franchise tax which became due and payable on April 1, 1954.

(h) The amount, if any, of the New York City special franchise tax for the tax year July 1, 1954 to June 30, 1955, which plaintiff becomes legally obligated to pay.

(i) The cost to plaintiff of removal of plaintiff's property from Government-owned post offices in New York City.

### Unreimbursed Cost of Power Conversion Equipment

31. The contract provided in paragraph 2(a) under the section headed *Variable Costs*, on page 9, as follows:

"The contractor in reliance upon this contract and the term of the contract is committing itself to expend a sum now estimated at $350,000 to acquire and install equipment to convert alternating current to direct current [sic] for the operation of the tube system. It is understood and agreed that Schedule A shall contain an item which shall represent the annual payment required for even amortization over the 10-year term of this contract of such cost when finally determined with interest at 3% per annum * * * "

The contract provided under the section headed *Variable Costs*, on pages 10 and 11, for reimbursement to plaintiff of its costs to acquire and install said equipment to convert the current in event of the termination of the contract by plaintiff under various circumstances.

32. During 1951 and 1952, plaintiff expended the sum of $214,870.13 to acquire and install equipment to convert direct current to alternating current for the operation of the tube system, and reported its charges to the Post Office Department, as required by the contract. The charges for this work were fair and reasonable, and following the audit by the Post Office Department of the books and records of the plaintiff for the years 1951 and 1952, defendant accepted said sum of $214,870.13 as the cost of such power conversion equipment for the purpose of calculating the monthly payments to be made by the defendant to the plaintiff under the contract in reimbursement of such cost.

33. Defendant, pursuant to the terms of the contract, during the years 1951, 1952 and 1953, reimbursed the plaintiff on account of such expenditures in the sum of $84,301.50, consisting of $73,305.66 as principal and $10,995.84 as interest. Such reimbursement payments were included in the monthly payments made by the defendant to the plaintiff under the contract. No other payments in connec-

tion with said expenditures have been made by defendant to plaintiff.

34. The difference between the plaintiff's total expenditures for such equipment, in the sum of $214,870.13, and the amount of $73,305.66 heretofore reimbursed by defendant to plaintiff on account of the principal of such expenditures, which difference is the amount claimed by plaintiff from defendant as the unpaid principal balance of the cost of such conversion equipment, is the sum of $141,564.47.

The contract provided for payment of interest on unpaid balances of the power conversion equipment cost, at the rate of three percent per annum which remained unpaid from December 1, 1953. There is no issue in this case as to the ownership or cost of removal of this equipment.

### Cost of Set of New Carriers

35. The contract provided in paragraph 2(a) under the section headed *Variable Costs*, on pages 9 and 10, as follows:

" * * * It is further understood and agreed that the contractor in preparation for adequate service under this contract from time to time will contract or arrange for the purchase of sets of new carriers and that such contracting or arrangement must be made at a considerable length of time before the carriers can be delivered and put into use."

The contract provided under the section headed *Variable Costs*, on pages 10 and 11, for reimbursement to plaintiff of its costs concerning new sets of carriers in the event of the termination of the contract under various circumstances.

36. During 1953 plaintiff contracted and arranged for the purchase of a set of new carriers for use in the pneumatic tube system in the fall of 1954. At the time the purchase order was placed for this set of new carriers it was expected that such set would be put into use in the tube system in the fall of 1954.

37. Plaintiff suspended work on the set of new carriers promptly after defendant notified plaintiff on December 7, 1953, that the pneumatic tubes would continue to be shut down until further notice. Following the plaintiff's letter to defendant of January 23, 1954, in which plaintiff announced that it was terminating the contract because of breach by the defendant, plaintiff promptly cancelled the contracts for the manufacture of a set of new carriers as to any uncompleted portion thereof.

38. The total adjusted cost to plaintiff on such cancellation and termination of its contracts and arrangements for the purchase of such set of new carriers is the sum of $30,290.56.

The major part of these costs to plaintiff were charges by Lamson Corporation, with whom the order for the manufacture of the set of new carriers was placed. Lamson Corporation and plaintiff are affiliated corporations, both being subsidiaries of Lamson Corporation of Delaware. It had been the custom of plaintiff for a period of years to have the carrier shells manufactured by Lamson Corporation. In the termination charges of Lamson Corporation to the plaintiff no profit was included.

39. The above termination charges of Lamson Corporation to plaintiff on account of cancellation of the purchase order for the set of new carriers in the amount of $30,290.56 included the sum of $2,739.04 representing inventory of Lamson Corporation in existence prior to the receipt of the purchase order from plaintiff in June 1953. Although the record establishes that $1,233.86 of this pre-existing inventory figure of $2,739.-04 would have been expended in the production of the contract for the set of new carriers if that contract had been completed, the record does not show that the inventory represented by that $1,-233.86 was either purchased for the contract which was terminated or could not have been used on other work of Lamson Corporation. Accordingly, plaintiff's claim for the new carriers is excessive

by the amount of $2,739.04 representing preexisting inventory and that amount should be deducted from the $30,290.56 leaving a net balance of cost totaling $27,551.52 which is reasonable and no part of which has been paid by defendant.

### Payment for December 1953 Expenses

40. As set forth in the contract, the defendant was obligated to pay plaintiff monthly amounts calculated in accordance with the terms of the contract. The amount which became due to plaintiff for the month of December 1953, excluding any amount representing reimbursement of principal cost of conversion equipment or interest thereon, was the sum of $27,960.94, no part of which has been paid by defendant to plaintiff.

### Expenses of January 1954

41. Following receipt of the letter from the Postmaster General on December 30, 1953, plaintiff maintained itself in a position of readiness to resume service if the defendant desired service resumed. Upon giving its notice of termination to the defendant by its letter of January 23, 1954, plaintiff thereupon released its employees as rapidly as possible. Wages and salaries paid by plaintiff to its employees for services in January 1954 and other normal expenses incurred in January 1954 aggregate the sum of $8,241.69. Such expenses were reimbursable costs under the contract. However, $2,000 included in this item represents the 1953–1954 Special Franchise Tax allocable to January 1954. The assessment for the second half of the fiscal year 1953–1954 is included in finding 47 herein. Accordingly, the expense for January 1954, paid by plaintiff, is $6,241.69.

### Anticipated Net Profits of Plaintiff For 1954–1960

42. Under that part of the contract of December 29, 1950, entitled *Variable Costs*, it is stated in part:

" * * * It is, accordingly, agreed that the compensation to be paid the contractor for its services hereunder, and as rental for the leased property shall be for the calendar year 1951, the sum of $352,-912.08 and shall be for each succeeding year the sum of $163,972.-31, and in addition to said sum in each succeeding year the amount of the contractor's costs for the preceeding calendar year of those items listed on Schedule A, annexed hereto and made a part hereof, but in no event shall the total compensation payable for any calendar year exceed the sum of $387,628.65. * * * "

The Schedule A referred to above included various taxes and operating expenses, salaries, pensions, maintenance and repair, patterns, jigs, fixtures and amortization of the cost of power conversion equipment. The sum of $352,-912.08 quoted above included an estimated amount to cover the 1951 Schedule A costs. In 1952 the sum of $350,691.-69 paid to plaintiff included the exact amount of its Schedule A 1951 costs and the $163,972.31. In 1953 plaintiff received payment in the sum of $324,-149.95 at a rate which would reimburse it for its 1952 costs with the qualifications stated in finding 46. Nothing was paid to represent the 12th month of 1953 during which time contract operations were suspended by defendant's notice to plaintiff. Plaintiff's claim for that month is set forth in finding 40.

The ceiling amount set in the contract is the product of the number of miles of the tube system, i. e., 25.0083 times $15,500, the ceiling rate of expenditure for the transmission of mail established by act of December 27, 1950, referred to in finding 21.

43. Out of the sum of $163,972.31 provided in the contract as the fixed sum plaintiff was to receive for each year (plus variable costs) the plaintiff was to

meet its other expenses of carrying on its business and realize its profits. Plaintiff's theory for computing its net profits is to deduct from $163,972.31 its constant costs each year, actual or estimated, which are not costs such as included in Schedule A to the contract. Plaintiff's claim for the years 1954 through 1960 is as follows:

For 1954 ................$136,301.59
For each of the years
 1955–60 ................ 139,241.59
For the aggregate of these
 7 years ................ 971,751.13

44. The constant costs which plaintiff would deduct as illustrated above are not defined or referred to in the contract. As used by plaintiff they included, among other things, such general expenses as life and health insurance, supplies, travel, professional services, directors' fees, postage, and, as operating expenses, clerical and stenographic salaries, rent, depreciation of machinery, telephone, and supplies. Plaintiff's claimed actual constant costs for 1949 were $19,972.31. In 1950 they were $25,050.67; 1951,

$23,396.83; 1952, $27,984.01; 1953, $27,626.10. The estimate of such costs for 1954 is $27,670.72 and for 1955 and subsequent years to 1960, inclusive, $24,730.72 for each such year.

Interest on indebtedness reported in finding 30 was not included as a refundable expense under variable costs, nor as a constant cost under contract operations.

45. The plaintiff prepared estimates of its variable costs for the years 1954 to 1959 for classifications of expense similar to those tabulated in Schedule A of its contract. Such costs would have been recovered had the contract run its full course through 1960. If we assume that plaintiff's constant costs, which were chargeable against its constant allowance under the contract for the determination of its contract income, would follow substantially the same ratios of variations as its variable costs, then a fair and reasonable determination of plaintiff's anticipated contract profits for the calendar years 1954 through 1960 is $952,008.88. The following tabulation reflects the basis for this determination:

| Years | Variable costs exclusive of amortization charges | | Constant costs and contract allowances | | Income from contract operations |
|---|---|---|---|---|---|
| | | | Costs | Allowances | |
| (a) Actual results of operations: | | | | | |
| 1951 ............ | $159,247.16 | | $23,396.83 | $163,972.31 | $140,575.48 |
| 1952 ............ | 171,559.30 | | 27,984.01 | 163,972.31 | 135,988.30 |
| 1953 ............ | 183,844.47 | | 27,626.10 | 163,972.31 | 136,346.21 |
| Totals ........ | 514,650.93 | | 79,006.94 | 491,916.93 | 412,909.99 |
| Average ........ | 171,550.31 | 100% | 26,335.65 | 163,972.31 | 137,636.66 |
| (b) Projected operations for succeeding years based upon estimates as follows: (*) | | | | | |
| 1953 ............ | 183,844.47 | 107.17% | 28,223.92 | 163,972.31 | 135,748.39 |
| 1954 ............ | 176,818.60 | 103.07% | 27,144.15 | 163,972.31 | 136,828.16 |
| 1955 ............ | 173,747.10 | 101.28% | 26,672.75 | 163,972.31 | 137,299.56 |
| 1956 ............ | 178,847.10 | 104.25% | 27,454.55 | 163,972.31 | 136,517.76 |
| 1957 ............ | 182,866.10 | 106.60% | 28,073.80 | 163,972.31 | 135,898.51 |
| 1958 ............ | 186,755.10 | 108.86% | 28,668.99 | 163,972.31 | 135,303.32 |
| 1959 ............ | 192,554.10 | 112.24% | 29,559.13 | 163,972.31 | 134,413.18 |
| Totals ........ | 1,275,432.57 | | 195,797.29 | 1,147,806.17 | 952,008.88 |

(*) The recoverable variable costs for 1954 are represented by the actual variable costs for 1953, other amounts are estimates which would be recoverable the succeeding year, none of which would exceed the maximum permissible under the contract.

## Excess of 1953 Over 1952 Variable Costs

46. In finding 42 it is noted that plaintiff received from defendant under the contract for 1953 the sum of $324,-149.95 for eleven months of that year. The contract allowance for December 1953 is reported in finding 40, other than amortization charges in connection with the electrical conversion which is allowed in full for the unamortized portion thereof in finding 34. The payments and the amount reported herein for 1953 were based in part upon the variable expenses incurred by plaintiff for 1952 and represent the recoupment in full for such expense. Plaintiff's variable expenses for 1953, which would have been recouped in full in 1954 were some $12,-285.16 in excess of its 1952 variable expense. Plaintiff claims this difference of $12,285.16 as a separate item of recovery.

The contract provided that, except for the first year of operations thereunder, the recoupment of variable expenses for any current year would be recovered in payments during the following year. Thus, the actual expense for variables during the last year of operations under the contract would never be recovered. The variable expenses paid during the first year of operation under this contract (1951) were based upon estimated sums which included an allowance of $40,250 representing an estimated sum for the amortization of the power conversion costs. The actual amortization taken by plaintiff in its 1951 variable costs was only $18,494.60. Thereafter the amortization was at the rate of $22,983.41 annually. The calendar year 1953 was the last year of contract operations. There is therefore no basis for allowing recovery of any of plaintiff's 1953 variable costs. However, plaintiff's 1953 variable costs actually incurred in that year have been included in the estimates projected over the following years for the purpose of determining plaintiff's anticipated profits for those years.

## New York City Special Franchise Taxes

47. Plaintiff is obligated to pay to the city of New York a tax payment due on April 1, 1954, being the second half of the special franchise tax levied on plaintiff's pneumatic tube system for the tax year July 1, 1953, to June 30, 1954. The item "Special Franchise Taxes—Manhattan" is one of the items of variable cost under Schedule A of the contract. This tax bill due and payable on April 1, 1954, was such a special franchise tax. Had the contract continued during its term, such tax payment due on April 1, 1954, in the sum of $12,792.-18 would have been included as a variable cost for the year 1954 and plaintiff would have been entitled to be reimbursed therefor under the contract.

48. The State Equalization Board of New York assessed the value for special franchise tax purposes of plaintiff's pneumatic tube system which is the subject of the contract, for the tax year July 1, 1954, to June 30, 1955, in the sum of $712,000. Plaintiff duly protested the assessment in a proceeding before the Supreme Court of the State of New York, Albany County, New York, on May 18, 1955, requesting that such assessed valuation be reduced from $712,-000 to zero because of the worthlessness of plaintiff's pneumatic tube system resulting from the termination of the contract. No decision in the case has been announced by the court. The city of New York has levied a special franchise tax based upon the assessed valuation of $712,000 for the tax year July 1, 1954, to June 30, 1955, in the amount of $26,-700, payable one-half (or $13,350) on October 1, 1954, and one-half (or $13,-350) on April 1, 1955. Plaintiff has not paid any part of this tax. If it is determined by the Supreme Court of the State of New York that for the tax year July 1, 1954, to June 30, 1955, plaintiff's pneumatic tube system had a value for purposes of special franchise tax, plaintiff will be obligated to pay the tax based upon such assessed valuation. Any such

tax so payable by plaintiff will be one of the items of variable cost under Schedule A of the contract under the heading "Special Franchise Taxes—Manhattan." Had the contract continued during its term, any special franchise tax payments due on October 1, 1954, and on April 1, 1955, for the tax year July 1, 1954, to June 30, 1955, would have been included as items of variable cost for the years 1954 and 1955, respectively, and plaintiff would have been entitled to be reimbursed therefor under the contract.

Removal of Equipment from Government-Owned Stations

49. The contract of December 29, 1950, contained the following agreement:

"*Fourth:* That the contractor will at his expense remove the tubes, power plants, receiving and dispatching apparatus, equipment and devices from leased Post Office premises, at the expiration of the term, or, except as otherwise herein provided, at the termination of the contract, or at the termination of the lease of any such leased premises where no relocation of the station is involved, if requested to do so by the Postmaster General."

50. At the time of the cancellation of the contract on December 29, 1953, by defendant, half of the post offices in which plaintiff's dispatching and receiving equipment, power plants and other property used with the pneumatic tube system were located, were in buildings owned by the defendant and the rest were in buildings owned by others and leased by defendant. The defendant insisted that plaintiff remove its equipment from all postal premises both leased and Government-owned. The defendant advised plaintiff that if it did not take the action suggested the Government would dispose of the equipment and credit the proceeds, if any, against the cost of removal.

51. The plaintiff advised defendant by letter on March 17, 1954, that the defendant had no right to require that plaintiff pay for the cost of removal from Government-owned premises or to dispose of plaintiff's equipment. Under protest, however, it advised defendant that arrangements would be made to remove the equipment from both Government-owned and leased post office premises and would include the cost of removal from Government-owned premises as a part of its claim against defendant. That claim, here presented, is for $25,650.

52. Plaintiff sought purchasers and entered into a contract with a salvage company on March 24, 1954, for the purchase of all of plaintiff's equipment in both Government-owned and Government-leased post office premises for the price of $60,000. The contract also provided that the plaintiff should pay to the salvage company the sum of $25,650 as the cost of removal of equipment from Government-owned premises. This was the best offer made to plaintiff and was reasonable. All of the property was removed by August 1954.

53. No action has been taken on plaintiff's claim by Congress, by any department of the United States, or in any judicial proceeding, other than appears in these findings. No person other than the plaintiff is the owner or is interested in this claim. No assignment or transfer of this claim or any part thereof or interest in it has been made.

Defendant's First Counterclaim

54. Defendant contends that the contract of December 29, 1950, was made "pursuant to discussions and negotiations, rather than pursuant to public advertisement as required by law with the result that the public competition in the letting of mail contracts contemplated by law was suppressed and defeated, and said purported contract was executed contrary to law, and is void and of no force and effect." Defendant

claims that money paid by defendant during the period from January 1, 1950, to November 30, 1953, was illegally paid under an invalid contract and was greatly in excess of the fair and reasonable value of the services rendered by plaintiff and that defendant is entitled to recover from plaintiff the total amount so paid less such sum as plaintiff might prove to be the fair and reasonable value of such services.

It is found that the year 1950 is not properly in question under the counterclaim because it was prior to the effective date of the contract in dispute. The total sum paid to plaintiff by defendant for 1951, 1952 and 1953 is $1,027,753.72. The reasonable value of plaintiff's services during these three years was not less than the sum paid.

### Defendant's Second Counterclaim

55. Defendant asserts that plaintiff was under obligation to remove its equipment from defendant's premises and to restore and repair damages caused thereto by installation and removal of such equipment. Defendant pleads that the reasonable cost to defendant to repair the buildings properly is approximately $28,600. There was no provision in the contract of December 29, 1950, relating to the repair or restoration of any premises in which plaintiff had installed its tubes and equipment, and the only provisions concerning the obligation of plaintiff to remove its property from post office premises at the termination of a contract related to removal from leased premises, with no mention of Government-owned premises. Some of the contracts between plaintiff and defendant prior to July 1, 1948, included provisions requiring plaintiff, at the request of the Postmaster General, to remove its property at the termination of the contract and to restore the premises to their condition existing before such alterations as were made for installation.

56. The tubes forming a part of plaintiff's pneumatic tube system passed through various floors, ceilings, partitions and walls of the post office stations which they connected. Tubes were sometimes suspended from the ceiling by pipe hangers while receiving and dispatching apparatus was secured to the floor. Power units were mounted on concrete foundations imbedded in the basement floors of the post offices or were set into depressions made in the floors for that purpose. Certain steel trap doors, floor plating and concrete foundations, which had no apparent use except in connection with plaintiff's equipment, were not removed. Holes were not repaired in any way except that some were covered by steel plates. Holes were left in floors, partitions and ceilings and fireproofing in various buildings was damaged in removal of hangers used to support the tubes.

57. The defendant offered proof that the reasonable cost of repairing leased post office premises would be $39,685. It estimates the cost of reasonable repairs to Government-owned buildings at $1,295. Plaintiff denies liability for these repairs under the contract but offered evidence that their total cost, if allowable to defendant, as a matter of law, should not exceed $16,616. All of the foregoing figures include reasonable allowances for profit and overhead. In addition, defendant's figures include 15 percent for drawings, specifications and supervision which would be required by the defendant but not by a private contractor for this type of job. A reasonable allowance for the repairs in question would be $20,000, if allowable as a matter of law.

58. Because of the nature of the equipment and the manner of its installation, it would have been impossible to remove it without some damage to the premises. None of the damages to the premises resulting from the removal of plaintiff's equipment has been shown to be the result of any failure on plaintiff's part to use ordinary care in doing such removal work.

Summary

59. The various items of plaintiff's claim for damages and the amount, if any, found to be recoverable on each item, are summarized as follows:

| Item of claim | Amount Recoverable |
|---|---|
| (a) Unreimbursed cost of power conversion equipment .. | $141,564.47 |
| (b) Cost of new set of carriers | 27,551.52 |
| (c) Payment for December 1953 expenses | 27,960.94 |
| (d) Expenses of January, 1954 | 6,241.69 |
| (e) Anticipated net profits for 1954–1960 | 0 |
| (f) Excess of 1953 over 1952 variable costs | 0 |
| (g) New York City special franchise taxes for the second half of the 1953–1954 tax year | 12,792.18 |
| (h) New York City special franchise taxes for 1954–1955 tax year | 0 |
| (i) Removal of equipment from Government-owned stations | 0 |
| Total | 216,110.80 |

Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States two hundred sixteen thousand one hundred ten dollars and eighty cents ($216,110.80).

It is further concluded that the defendant is not entitled to recover on its counterclaims, and the counterclaims are therefore dismissed.